SKELLY OIL COMPANY, Plaintiff,

v.

FEDERAL ENERGY ADMINISTRA-
TION, Frank G. Zarb, Administrator,
FEA and Melvin Goldstein, Director, Of-
fice of Exceptions and Appeals, FEA,
Defendants.

No. 76–C–238–C.

United States District Court,
N. D. Oklahoma.

Sept. 8, 1977.

Kathleen A. O'Connor, Richard J. Dent,
John F. Smith, Sam C. Oliver, Neal F. Leh-
man, Skelly Oil Co., Tulsa, Okl., William
Simon, William E. Wickens, Frederick S.
Frei, Howrey & Simon, Washington, D. C.,
for plaintiff.

Hubert A. Marlow, Asst. U. S. Atty., Tul-
sa, Okl., Rex E. Lee, Barbara Allen Bab-
cock, Stanley D. Rose, John Lillard, Dept. of
Justice, Washington, D. C., for defendants.

## ORDER

COOK, District Judge.

This is an action brought pursuant to the
Economic Stabilization Act of 1970 (ESA),
Title 12 U.S.C. § 1904 note § 211, as incor-
porated by § 5(a)(1) of the Emergency Pe-
troleum Allocation Act of 1973 (EPAA), 15
U.S.C. § 754(a)(1), and the Declaratory
Judgment Act, 28 U.S.C. § 2201. Plaintiff,
Skelly Oil Company (Skelly) seeks judicial
review of a Decision and Order of the Fed-
eral Energy Administration (FEA), Office
of Exceptions and Appeals, and a declara-
tion that the regulations of the FEA pur-
porting to control the pricing and allocation
of solvents are "improper, illegal and in
excess of the agency's authority." Now
before the Court are cross-motions for sum-
mary judgment, as well as plaintiff's mo-
tions to strike certain affidavits filed by the
defendants in support of their motion for
summary judgment.

Plaintiff has moved to strike the
affidavits of Lon W. Smith and Dr. J. Lisle
Reed, on the ground that they contain irrel-
evant testimony, self-serving opinions, con-
clusions of law and purported facts which
are not within the personal knowledge of
the affiants. In the alternative, Skelly asks
the Court to disregard the "offensive" por-
tions of the affidavits. Motions to strike
are not favored, *Vinita Broadcasting Com-*

*pany v. Colby,* 320 F.Supp. 902 (N.D.Okl. 1971), and plaintiff's motions are not directed toward any specific portions of the affidavits. The Court has read the affidavits and is of the opinion that they certainly are not completely defective. Therefore, the Court will consider the affidavits insofar as the testimony contained therein is admissible and will disregard any inadmissible matter. See *Perma Research & Development Co. v. Singer Co.,* 410 F.2d 572 (2nd Cir. 1969).

■ The substantive issues raised by the cross-motions for summary judgment arise from the following undisputed facts. On November 27, 1973, the EPAA, 15 U.S.C. §§ 751 *et seq.* was enacted. That statute directed the President to promulgate a regulation allocating crude oil, residual fuel oil and refined petroleum products by amount and price. The price of petroleum and certain petroleum products was also being controlled at that time by regulations promulgated by the Cost of Living Council (CLC) pursuant to authority derived from the ESA. The President's authority under the EPAA and the ESA was delegated to the Federal Energy Office (FEO) on December 6, 1973. The FEO first published its pricing regulations on January 15, 1974 in 10 C.F.R. Part 212. The term "covered product" was defined in 10 C.F.R. § 212.31 as follows:

> " 'Covered product' means a product described in the 1972 edition, Standard Industrial Classification Manual, Industry Code 1311 (except natural gas), 1321, or 2911."

At that time, Skelly began to treat its solvents, which are the products at issue in this case, as "covered products" for purposes of the regulation and priced them accordingly. On February 4, 1974, 10 C.F.R. § 212.31 was amended to read as follows:

> " 'Covered products' means a product described in the 1972 edition, Standard Industrial Classification Manual, Industry Code 1311 (except natural gas), 1321 (except ethane) or 2911 (including benzene and toluene, but excluding ortho-xylene, meta-xylene, para-xylene and buta-

dienes), and all forms of benzene and toluene."

Skelly continued to price its solvents in accordance with this regulation. On April 5, 1974, 10 C.F.R. § 212.31 was again amended by the FEO to read as follows:

> " 'Covered products' means crude oil, residual fuel oil and refined petroleum products."

"Refined petroleum product" was defined at that time as follows:

> " 'Refined petroleum product' means gasoline, kerosene, middle distillates (including Number 2 fuel oil), LPG, refined lubricating oils, or diesel fuel."

Skelly determined that its solvents did not fall within this definition of "covered products", and effective May 1, 1974, Skelly began to price its solvents as non-covered products. In June, 1974, pursuant to the Federal Energy Administration Act of 1974, the FEA was created and assumed the regulatory duties previously exercised by the FEO. On October 31, 1974, the FEA issued a Notice of Probable Violation (NOPV) to Skelly, in which it took the position that solvents remained "covered products" under the April 5, 1974 amendments to the regulations and that Skelly was in violation of the regulations by treating its solvents as non-covered after May 1, 1974. On November 12, 1974 Skelly filed with the FEA its reply to the NOPV, in which it made essentially the same arguments now urged upon this Court. On January 16, 1975, 10 C.F.R. § 212.31 was again amended to read as follows:

> " 'Covered products' means aviation fuels, benzene, butane, crude oil, gas oil, gasoline, greases, hexane, kerosene, lubricant base oil stocks, lubricants, naphthas, natural gas liquids, natural gasoline, No. 1 heating oil and No. 1–D diesel fuel, No. 2 heating oil and No. 2–D diesel fuel, No. 4 fuel oil and No. 4–D diesel fuel, propane, residual fuel oil, special naphthas (solvents), toluene, unfinished oils, xylene, and other finished products. A blend of two or more particular covered products is considered to be that particular covered product constituting the major proportion of the blend."

Following this amendment, Skelly once again began to price its solvents as covered products. On November 24, 1975, the FEA issued a Remedial Order to Skelly, in which it again found that solvents were "covered products" between May 1, 1974 and January 14, 1975. Skelly was ordered to refund to purchasers of its solvents during that time period a total of approximately $2,594,000.00, plus interest. On December 4, 1975, Skelly filed with the FEA its appeal from the Remedial Order. The appeal was denied in all material respects by the FEA's Office of Exceptions and Appeals on March 19, 1976. It is this decision by the FEA which Skelly now asks this Court to review.

In considering the validity of the regulation in question, this Court is limited to a determination of whether the regulation is in excess of FEA's authority under the EPAA, is arbitrary or capricious, or is otherwise unlawful under the criteria set forth in Title 5 U.S.C. § 706(2). *Air Transport Association of America v. Federal Energy Office*, 382 F.Supp. 437 (D.C.1974), affirmed 520 F.2d 1339 (Em.App.1975). Skelly's first contention is that the FEA does not have the statutory authority under the EPAA to regulate the pricing of solvents. Such authority, if it exists, would arise from Title 15 U.S.C. § 753(a), which provides in pertinent part as follows:

". . . [T]he President shall promulgate a regulation providing for the mandatory allocation of crude oil, residual fuel oil, and each refined petroleum product . . . ."

Title 15 U.S.C. § 752(5) defines "refined petroleum product" as follows:

"The term 'refined petroleum product' means gasoline, kerosene, distillates (including Number 2 fuel oil), LPG, refined lubricating oils, or diesel fuel."

All parties agree that if solvents are within the scope of the EPAA, it would be as "refined petroleum products", and further as "distillates". The issue is therefore whether Congress intended the term "distillates" to encompass solvents.

In interpreting the authority granted by the EPAA, Title 15 U.S.C. § 753(a) must be read together with the objectives which the exercise of that authority is to accomplish. *Cities Service Company v. Federal Energy Administration*, 529 F.2d 1016 (Em.App. 1975). This is merely an extension of the well-settled doctrine that a statute should be read, ". . . assuming that it is susceptible of either of two opposed interpretations, in the manner which effectuates rather than frustrates the major purpose of the legislative draftsmen." *Shapiro v. United States*, 335 U.S. 1, 31, 68 S.Ct. 1375, 1391, 92 L.Ed. 1787 (1948), rehearing denied 335 U.S. 836, 69 S.Ct. 9, 93 L.Ed. 388 (1948). See also *Shultz v. Louisiana Trailer Sales, Inc.*, 428 F.2d 61 (5th Cir. 1970), *cert. denied* 400 U.S. 902, 91 S.Ct. 139, 27 L.Ed.2d 139 (1970). The major purpose of the EPAA is expressed in Title 15 U.S.C. § 751(b), which provides:

"The purpose of this chapter is to grant to the President of the United States and direct him to exercise specific temporary authority to deal with shortages of crude oil, residual fuel oil, and refined petroleum products or dislocations in their national distribution system. The authority granted under this chapter shall be exercised for the purpose of minimizing the adverse impacts of such shortages or dislocations on the American people and the domestic economy."

This purpose is to be accomplished through regulations, which Congress intended to provide for:

"(A) protection of public health (including the production of pharmaceuticals), safety and welfare (including maintenance of residential heating, such as individual homes, apartments and similar occupied dwelling units), and the national defense;

(B) maintenance of all public services (including facilities and services provided by municipally, cooperatively, or investor owned utilities or by any State or local government or authority, and including transportation facilities and services which serve the public at large);

(C) maintenance of agricultural operations, including farming, ranching, dairy,

and fishing activities, and services directly related thereto;

(D) preservation of an economically sound and competitive petroleum industry; including the priority needs to restore and foster competition in the producing, refining, distribution, marketing, and petrochemical sectors of such industry, and to preserve the competitive viability of independent refiners, small refiners, nonbranded independent marketers, and branded independent marketers;

(E) the allocation of suitable types, grades, and quality of crude oil to refineries in the United States to permit such refineries to operate at full capacity;

(F) equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices among all regions and areas of the United States and sectors of the petroleum industry, including independent refiners, small refiners, nonbranded independent marketers, branded independent marketers, and among all users;

(G) allocation of residual fuel oil and refined petroleum products in such amounts and in such manner as may be necessary for the maintenance of, exploration for, and production or extraction of—

(i) fuels, and

(ii) minerals essential to the requirements of the United States, and for required transportation related thereto;

(H) economic efficiency; and

(I) minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms." Title 15 U.S.C. § 753(b)(1).

The legislative history of the EPAA, as well as the language of the Act itself, are the best indications of the intent of Congress regarding the scope of the EPAA. Skelly does not seriously contend that solvents are not refined from petroleum; rather, its argument is based primarily upon technical definitions of "distillates", under which it contends solvents do not fall. (See affidavit of Edward D. Evans). However, Congress expressly rejected such technical restrictions on the definition of "distillates".

"Special mention should be made of the term 'refined petroleum product' which is taken from the House amendment. This term is defined to mean kerosene, gasoline, distillates (including Number 2 fuel oil), LPG (as further defined to mean propane and butane), refined lubricating oils, or diesel fuel. . . . It is understood that the term 'distillates' when applied in a technical sense would encompass only Numbers 1, 2, and 4 fuel oils. It is the committee's intent, however, that this term also reach to include naptha (sic) and benzene so as to require the allocation of these products as may be necessary to accomplish the objective of restoring and fostering competition in the petrochemical sector of industry. In this respect the conference committee wishes to emphasize that, in expressing congressional concern with fostering competition in the petrochemical industry, the committee intends to also identify petrochemical feedstock needs as important end-uses for which allocation should be made." Conference Report 93–628, 1973 U.S.Code Cong. & Admin.News, p. 2693.

Skelly argues that Congress did not intend the terms "naphtha" and "benzene" to include solvents because those substances "generally" or "most commonly" have other uses. (See affidavit of Edward D. Evans). However, even a cursory review of industry and lay publications indicates that those terms are commonly understood to include solvents. *Webster's Third New International Unabridged Dictionary* (1971) defines "naphtha" as "any of various volatile often flammable liquid hydrocarbon mixtures used chiefly as solvents and diluents and as raw materials for conversion to gasoline." "Benzene" is also defined as having a chief use as a solvent. In *Guthrie, Petroleum Products Handbook* (1st ed. 1960), "naphtha" is defined as "[l]iquid hydrocarbon fractions, generally boiling within the gasoline range, recovered by the distillation of crude petroleum. Used as solvents, dry-

cleaning agents, and charge stocks to re-forming units to make high-octane gasoline." The same term is defined in *Langenkamp, Handbook of Oil Industry Terms and Phrases* (1974) as "[a] volatile, colorless liquid obtained from petroleum distillation; used as a solvent in the manufacture of paint, as dry-cleaning fluid, and for blending with casinghead gasoline in producing motor gasoline." The terms "naphtha" and "solvent" are used interchangeably in *Nelson, Petroleum Refining Engineering* (4th ed.). The EPAA itself provides, in Title 15 U.S.C. § 753(a), that the mandatory allocation shall extend to "*each* refined petroleum product." The Conference Committee emphasized the all-inclusive scope of the products intended to be regulated when it said:

"It is the Committee's understanding that an allocation program, if it is to work at all, must be comprehensive in scope and therefore must include the major refined components of a barrel of crude oil." *Id.* at 2697.

Skelly has, through the affidavit of its chief chemist, described the importance of its solvents to the national economy.

"Skellysolves are used by many industries in a variety of ways. They are used in the vegetable oil extraction industry for extracting materials such as soybean oil, cottonseed oil, and other edible and non-edible oils and greases. The pharmaceutical industry uses Skellysolves in the extraction of vitamins and hormones and as solvents for certain edible waxes. Some Skellysolves are sold as laboratory reagents for a variety of laboratory applications. The rubber industry uses Skellysolves for rubber solvents, special rubber cements and for chemical processing applications. These solvents are also used for such applications as the preparations of sealants for cans, adhesives for home and industrial tapes, printing inks, home and industrial wax preparations, polishes and cloth impregnation chemicals. The paint and varnish industry uses a number of Skellysolves for thinners and diluents. Skellysolves are also used in the dry cleaning industry and for metal and tool cleaning and degreasing. . . .

[T]hey are favored for industrial applications such as oil extraction, chemical processing and dry cleaning." Affidavit of Edward D. Evans at pp. 2–3.

Based upon the Congressional declarations of the comprehensive nature of the products covered by the EPAA, the existence of definitions of "naphtha" and "benzene", available to Congress at the time the Act was passed, which indicate that those products are used as solvents, and Skelly's own statements as to the importance of solvents to the national economy, this Court has concluded that the major purpose and goals of the EPAA would clearly be advanced by a construction of the Act which places solvents in the category of "refined petroleum products" and that such purpose and goals would be frustrated by attributing to Congress a contrary intent. It is therefore the determination of the Court that solvents are covered by the mandatory allocation provisions of Title 15 U.S.C. § 753.

Skelly argues that "[i]f FEA had the authority to regulate solvents during the period April 5, 1974, to January 16, 1975, it expressly failed to exercise such authority. . . ." Skelly initially recognized the FEA's "authority" to regulate solvents, and it priced its solvents as "covered products" beginning with the January 15, 1974 regulations. However, it contends that with the amendment of April 5, 1974, the FEO removed solvents from the list of "covered products" and in effect exempted them until January 16, 1975, when Skelly again began pricing its solvents as "covered products". By construing the FEA's responsibility under the EPAA as "authority to regulate", Skelly has misinterpreted the Act. Title 15 U.S.C. § 753(a) provides that ". . . the President *shall* promulgate a regulation providing for the *mandatory* allocation . . ." of the relevant products, in this case solvents. The Act thus imposes a mandatory, non-discretionary duty to promulgate a regulation allocating petroleum products. *Consumers Union of United States, Inc. v. Sawhill*, 512 F.2d 1112 (Em. App.1975), vacated on other grounds 525

F.2d 1068 (Em.App.1975). This duty extends to all products covered at the time the EPAA was enacted, including solvents. Products can be exempted from the coverage of the Act only by Congress after the procedures specified in Title 15 U.S.C. § 760a have been complied with. Those procedures include a Presidential finding that such exemption will not have an adverse impact on the supply or price of any petroleum product and will not be inconsistent with the attainment of the stated objectives of the Act. There is no contention in this case that such a procedure was utilized to exempt solvents from the coverage of the EPAA. It is well settled that the authority of an administrative agency to promulgate regulations is limited by the statute authorizing the regulations, and that regulations which exceed Congressional authority are void. *Real v. Simon*, 510 F.2d 557 (5th Cir. 1975), rehearing denied 514 F.2d 738 (5th Cir. 1975); *Federal Maritime Commission v. Anglo-Canadian Shipping Co.*, 335 F.2d 255 (9th Cir. 1964). Thus, to the extent that the FEO's regulation of April 5, 1974 purported to exempt solvents from the EPAA without complying with Title 15 U.S.C. § 760a, it was in excess of Congressional authority and therefore void. See *Consumers Union of United States, Inc. v. Sawhill*, supra. In its Memorandum in Support of its Motion for Summary Judgment, Skelly twice recognizes the possibility that the purported exemption was unlawful:

"It appears that FEA further reasons that solvents, had they been exempted by the April 5 amendment, should have, *a fortiorari*, appeared in the list in Section 210.34(a) as exempt products. If this were not the case, then FEA would have, by its own words, unlawfully exempted solvents from the coverage of its pricing regulations. Skelly suggests that not only is this observation fully within the realm of possibility, but it probably is an apt characterization of what actually occurred." Skelly Memorandum, p. 25.

"It appears to Skelly that in the confusion surrounding the transition from those products regulated under the ESA to those regulated under the EPAA, solvents were deleted from the definition of the term 'covered products'. Perhaps this omission, as FEA suggests, did result in an unlawful exemption of solvents from FEA's pricing regulations. In any event, solvents were no longer covered products for the purposes of FEA's pricing regulations." *Id.* at p. 26.

Because solvents are within the scope of the mandatory allocation provisions of the EPAA, the FEO and FEA had the non-discretionary duty to include them in their definitions of "covered products". Solvents were so included in the first regulations, issued January 15, 1974, and Skelly priced its solvents as "covered products" at that time. Assuming, as Skelly contends, that the FEO's regulation of April 5, 1974 could be interpreted as entirely excluding or exempting solvents from its coverage, such exemption was in excess of the FEO's authority and therefore void. The purported exemption being void, it is clear that solvents remained, as a matter of law, "covered products" between April 5, 1974 and January 16, 1975. Therefore, Skelly was incorrect in treating its solvents as non-covered products during the period of May 1, 1974 to January 14, 1975. The Court does not mean to attribute any degree of bad faith to Skelly for its interpretation of the April 5, 1974 regulation, and it would agree that "Skelly is not a seer nor can it define the intent of FEA underlying its own regulatory definitions." The Court has not found it necessary to weigh the merits of the conflicting interpretations because it has determined as a matter of law that the FEO and FEA had a duty to treat solvents as "covered products" in the absence of compliance with the statutory exemption procedures defined in Title 15 U.S.C. § 760a. The Remedial Order which is the subject of this review does not attempt to punish Skelly for its interpretation of the April 5, 1974 regulation; it merely seeks from Skelly a refund of the moneys it would not have received had the FEO and FEA clearly and correctly followed the mandates of the EPAA. The Court is not

expressing any opinion regarding the merits of any possible future action for civil or criminal penalties brought against Skelly based upon an alleged violation of the April 5, 1974 regulation.

For the foregoing reasons,

IT IS ORDERED that the plaintiff's motions to strike are overruled.

IT IS FURTHER ORDERED that the plaintiff's motion for summary judgment is overruled and the defendants' motion for summary judgment is sustained.