**GETTY OIL COMPANY, Appellant,**

v.

**DEPARTMENT OF ENERGY, and James R. Schlesinger, Secretary of Energy, Appellees.**

**No. 10–14.**

Temporary Emergency Court of Appeals.

Argued Jan. 13, 1978.

Decided July 18, 1978.

William E. Wickens, Washington, D. C., with whom William Simon and Frederick S. Frei, Howrey & Simon, Washington, D. C., Richard J. Dent, Tulsa, Okl., and Kathleen A. O'Connor, Los Angeles, Cal., of counsel, were on the brief for appellant.

Mary Ann Clifford, Washington, D. C., with whom Barbara Allen Babcock, Asst. Atty. Gen., and Dennis G. Linder, Dept. of Justice, Washington, D. C., were on the brief for appellees.

Before BECKER, CARTER and ZIRPO-LI, Judges.

BECKER, Judge:

The writing of this opinion was reassigned after the original assignment.

This is an appeal from a final summary judgment granted on motion of the appellees, defendants in the action in the United States District Court for the Northern District of Oklahoma. When the motion of appellees for summary judgment was granted, an order was entered denying the contemporaneous motion of appellant for summary judgment. The findings of fact and conclusions of law of the District Court are stated in a lucid published opinion of The Honorable H. Dale Cook, United States District Judge for the Northern District of Oklahoma. *Skelly Oil Co. v. Federal Energy Administration, et al.* (N.D.Okl.1977), 448 F.Supp. 16.

We affirm the judgment of the District Court.

Getty Oil Company (Getty) has succeeded to the interests of Skelly Oil Company (Skelly) by merger. Pursuant to Rule 43 F.R.App.P., on the motion of Getty, Getty is hereby substituted as appellant for Skelly.

The original defendants were the Federal Energy Administration (FEA), Frank G. Zarb, Administrator of FEA (Administrator), and Melvin Goldstein, Director, Office of Exceptions and Appeals of FEA. Because of the creation of the superseding Department of Energy (DOE) and the succession of James R. Schlesinger, Secretary of Energy (Secretary) to Frank G. Zarb, Administrator, DOE is hereby substituted for FEA and James R. Schlesinger, Secretary, is hereby substituted for Frank G. Zarb, Administrator of FEA as appellees herein. Melvin Goldstein, Director of The Office of Exceptions and Appeals is dis-

missed as a party because his joinder as a defendant below was unnecessary and inappropriate.

The action below was commenced by the filing by Skelly of a "Complaint for Review of Administrative Action and Declaratory Judgment" (R. 1–38). Defendants filed an answer consisting of three defenses, including failure to exhaust administrative remedies, and a prayer for general relief (R. 74–81). Jurisdiction of the District Court, and of this Court on appeal, is not controverted and is established.

The materials submitted in support of the motion of appellant for summary judgment (R. 82, 83) consisted of the pleadings, identified documents, and an affidavit of Edward D. Evans, Chief Chemist of Skelly (R. 128–130) with exhibits attached thereto (R. 130–335).

The cross-motions of appellees for summary judgment (R. 133, 134) relied on the pleadings, identified documents, and the affidavits of J. Lisle Reed, then Director of the Office of Oil and Gas of the FEA (R. 189–209) and of Lon W. Smith, then Acting Director of Case Resolution, Office of Compliance of FEA (R. 336–337), with the exhibit attached thereto (R. 338–362) consisting of a judicial opinion.

Appellant filed motions to strike the affidavit of Lon W. Smith (R. 363, 364) and the affidavit of J. Lisle Reed (R. 365, 366) on the generally stated grounds that each contained irrelevant and self-serving testimony, opinions and conclusions, facts not within the personal knowledge of the affiants, and on the general ground that affiants were not competent to testify to the matters in their affidavits if called to testify. In the alternative the District Court was requested to disregard the unspecified "offensive" portions of the affidavits, which alternative request the District Court granted.

### THE CLAIM OF APPELLANT FOR RELIEF

In its complaint, Skelly, predecessor of appellant Getty, states that it sold solvents ("Skellysolves") manufactured at its refinery, and purchased by it, during the period from January 15, 1974, until the filing of the complaint on June 1, 1976. These solvents derived from petroleum are described as "relatively pure hydrocarbon fractions derived from further processing of a hydrocarbon fraction that boils in the range of 80–450 degrees Fahrenheit" (Appellant's Br. 3, R. 128–219). This fraction which boils at 80–450 degrees Fahrenheit is admittedly known by the generic name "Naphtha" (Appellant's Br. 3, R. 128, 195). Naphtha is one of several petroleum "distillates" (Appellant's Br. 3, R. 129, 192–193). Appellant contends that "Naphtha" and "Special Naphtha" are "different things" when the terms are used in the petroleum industry, FEA regulations, and federal statutes, and that the term Naphtha excludes special Naphtha solvents such as Skellysolves, the subject of this appeal.

The term "refined petroleum products" is defined in Title 15, U.S.C. § 752(5) of the controlling Emergency Petroleum Allocation Act of 1973 (EPAA) as follows: ". . . gasoline, kerosene, distillates (including Number 2 fuel oil), LPG, refined lubricating oils, or diesel fuel."

In its complaint, Skelly further stated that on January 15, 1974, when the pricing regulations of the Federal Energy Office (FEO), the predecessor of FEA, (10 C.F.R. Part 212, § 212.31) became effective, Skelly construed its Skellysolves as covered products and priced them accordingly (R. 3). After FEO amended its definition of covered products, effective May 1, 1974, contained in 10 C.F.R. § 212.31, *supra*, by deleting any reference to the Standard Industrial Classification Manual, Industry Code 1311, Skelly no longer priced its products as covered products (R. 3).

Skelly admitted that on November 4, 1974, it received a Notice of Probable Violation (NOPV) of 10 C.F.R. § 212.82 and § 212.83, resulting from its alleged misconstruction of 10 C.F.R. § 212.31, *supra*. Skelly's administrative contest of this NOPV ensued. On November 24, 1975, FEA issued to Skelly a Remedial Order, finding

explicitly that the solvents in issue were "covered products" from May 1, 1974, to January 15, 1975, the period in issue in this action (Appellant's Br. 6, R. 4, 419). An unsuccessful administrative appeal from the merits of the Remedial Order followed.

This Remedial Order required Skelly to refund $2,954,000 and interest to purchasers during that period (Appellant's Br. 6, R. 219). On appeal, the portion of the latter Remedial Order for restitution was remanded for recalculation. Otherwise, Skelly's appeal was denied (Appellant's Br. 6, R. 25–38).

On January 16, 1975, 10 C.F.R. § 212.31 was again amended expressly to include "special naphthas (solvents)" (R. 8, 40 Fed. Reg. 2795).

## THE DECISION OF THE DISTRICT COURT

As shown in detail in its published opinion reported in 448 F.Supp. 16, *supra*, the District Court concluded (1) that the Emergency Petroleum Allocation Act of 1973 (EPAA), Title 15, U.S.C. § 751, *et seq.*, covered solvents of appellant in the category of "refined petroleum products"; (2) that the EPAA imposed a mandatory, non-discretionary duty to promulgate a regulation to allocate and control prices of all products covered by regulation at the time that EPAA was enacted; that, to the extent the amended regulation of April 5, 1974, purported to exempt the solvents in issue without formal action complying with the procedures of Title 15, U.S.C. § 760a, it was void. (The President has since taken formal action under § 760a to except the solvents in question from regulation under the EPAA (Appellant's Br. 6).)

## THE ISSUES PRESENTED

In its original brief (page 1) appellant describes the issues presented as follows:

I. Does the Emergency Petroleum Allocation Act of 1973 confer authority upon the Federal Energy Administration to regulate the price of the solvents which are the subject of this appeal?

II. If the Emergency Petroleum Allocation Act of 1973 does authorize the Federal Energy Administration to regulate the price of the solvents which are the subject of this appeal, is that authority mandatory and non-discretionary or implied and discretionary?

III. Did the Federal Energy Administration fail to exercise such authority during the relevant time period and, if so, does that failure preclude a holding that appellant violated the price regulation?

## DECISIONS ON THE ISSUES

### I AND II

■ Since we agree with the holding of the District Court, and the reasoning employed in reaching its decision, that the EPAA imposed a mandatory non-discretionary duty to regulate the pricing and allocation of the Skellysolves, the issues I and II are resolved in favor of appellees. Cf. *Consumers Union of U. S., Inc. v. Sawhill* (Em. App.1975), 512 F.2d 1112, *vacated*, 525 F.2d 1068; *Mobil Oil Corporation v. Federal Energy Administration* (N.D.Tex.1977), 435 F.Supp. 983, *aff'd* (Em.App.1977), 566 F.2d 87.

The solvents in issue are clearly within the definition of "refined petroleum products" in § 752 quoted above, which expressly includes "distillates". Title 15, U.S.C. § 752(5). Appellant's argument based on industrial usage of terms is without merit. *Mobil Oil Corporation v. Federal Energy Administration, supra.*

The hypertechnical argument that the pricing and allocation of the solvents in issue were somehow exempted from the mandatory coverage of the EPAA is unconvincing and unsupported in the plain language of the EPAA. The intent of Congress expressed in ordinary language prevails. *Mobil Oil Corporation v. Federal Energy Administration, supra*, 566 F.2d l.c. 97, 98.

Appellant contends that the definition of "covered products" in the amended price regulation effective May 1, 1974, to January 15, 1975, "exempted" and failed to cover the solvents in issue. Its contention is based on an obvious minor defect in drafting a subordinate definition of "middle distillates" in amended 10 C.F.R. § 212.31 covering pricing "Refined petroleum products." Appellant concedes that the deficiency in the definition was supplied before May 1, 1974, and after January 15, 1975, by reference to "covered product" as any product described in the Standard Industrial Classification Manual, Industry Code 1311 (except natural gas).

Under the controlling decisions of this Court cited above, the statute directing mandatory control of the solvents in issue made any deficiency in the regulation 10 C.F.R. § 212.31 immaterial. The FEO and the FEA had no power to "exempt" any covered products by regulation. The power to exempt products covered by the EPAA was reserved to the President and Congress and required to be exercised in the manner prescribed by § 706a.

We are in full agreement with the District Court on these constructions of the EPAA.

### III

The third contention of appellant, that the FEA failed to exercise its statutory authority to regulate the price of the solvents in issue, is without merit. As a matter of law, as concluded above, the FEA was required by the EPAA and Title 15 U.S.C. § 752 thereof, to regulate the price and allocation of the solvents in issue. The regulations must be construed consistently with this statutory duty. *Consumers Union of U. S., Inc. v. Sawhill, supra,* 525 F.2d l.c. 1077. The fact that the price of the solvents in issue had been regulated under the now expired Economic Stabilization Act is significant in construing the EPAA and regulations issued thereunder. *Mobil Oil Corporation v. Federal Energy Administration, supra,* 566 F.2d l.c. 89. Further, the allocation of the solvents in issue was clearly covered by the contemporaneous regulations of the FEA. 10 C.F.R. § 211.182. The significance of this is precisely stated by Judge Jameson in footnote 17 of *National Helium Corporation v. Federal Energy Administration* (Em.App.1977), 569 F.2d 1137, l.c. 1145, as follows:

"National acknowledges the existence of allocation regulations which covered natural gasoline, but contends it cannot be deemed to have had notice of coverage, under price regulations because the two regulatory programs were distinct. Price regulations and allocation regulations, however, derive from the same authority. If National knew of allocation regulations it should have expected the application of price regulations as well."

Under this rule the existence of the allocation regulation was adequate and fair notice to the appellant that the solvents in issue were covered products the price of which was regulated.

Judge Jameson graphically described the difficult conditions under which the regulations were drafted by the Federal Energy Office (FEO) as the expiration date of the Economic Stabilization Act approached. *National Helium Corporation v. Federal Energy Administration, supra,* 569 F.2d l.c. 1144. The regulations must be read liberally when drafted under these circumstances.

The question arises: By what regulation was the price of the solvents in issue regulated? The answer is obvious. The price regulation 10 C.F.R. § 212.83 governed the price of all covered products. It was a general price rule in being at all times material in this case, stated fully in understandable narrative and symbolic equations. Appellant priced the solvents in issue under this regulation before May 1, 1974, and after January 15, 1975. Appellant wrongfully failed to price its solvents under the price regulation in the period from May 1, 1974, to January 15, 1975.

Further, appellant relies on principles of due process and equitable estoppel in support of its claim that the judgment of the District Court should be reversed even if issues II and III are ruled in favor of the

appellees. We disagree for many reasons. For to approve application of these doctrines in these circumstances would vitiate the intent and mandate of Congress in the enactment of the EPAA, that we and the District Court perceive; would vitiate the doctrine of *Consumers Union of U. S., Inc. v. Sawhill, supra*; and would extend the doctrines of due process and equitable estoppel beyond the limits of the law.

■ There is no violation of due process in imposing price regulation and allocation obligations in the energy emergency or any similar emergency. *Bowles v. Willingham*, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944); *Condor Operating Company v. Sawhill* (Em.App.1975), 514 F.2d 351. The EPAA and the regulations were not so vague that a due process violation occurred. On this issue the authorities relied on by appellant are inapposite.

■ While we do not believe the elements of equitable estoppel exist in this record, the doctrine cannot be invoked to avoid duties lawfully imposed by Congress to protect the public interest. *Scott Paper Company v. Marcalus Manufacturing Co.*, 326 U.S. 249, l.c. 257, 66 S.Ct. 101, l.c. 105, 90 L.Ed. 47, l.c. 52; *United States v. Consolidated Mines & Smelting Co., Ltd.* (C.A. 9 1971), 455 F.2d 432, l.c. 446–447.

For the foregoing reasons the orders and judgment of the District Court are affirmed.

ZIRPOLI, Judge, dissenting:

I respectfully dissent. I cannot accept the proposition that the EPAA imposed upon the FEA "a mandatory non-discretionary duty" to regulate the price of the solvents at issue here and that this court therefore need not examine the pricing regulations to determine whether they in fact applied to appellant's product. While I believe that the agency has the authority under the EPAA to regulate the price of solvents, I consider it wholly impermissible for the agency to contend that, while it may have failed to include such products in its

pricing regulations, the price of such products was nonetheless subject to controls since the agency had no right to promulgate regulations that did not include solvents.

The agency's mandatory duty to regulate the price of solvents is presumably found in section 4(a) of the EPAA, 15 U.S.C. § 753(a), which provides in pertinent part:

> [T]he President shall promulgate a regulation providing for the mandatory allocation of crude oil, residual fuel oil, and each refined petroleum product, in amounts specified in . . . and at prices specified in . . . such regulation.

Having concluded that solvents fall within the scope of the term "each refined petroleum product," the district court merely noted the fact that the statute appears to *require* the President to impose price controls and concluded that the price of solvents was *ipso facto* controlled, without regard to the action taken by the agency.

The majority, in adopting the reasoning of the district court, conveys the impression that the inclusion of solvents within the category of refined petroleum products is a self-evident truth. On the contrary, the *power* of the agency to regulate these products, as distinguished from its duty to do so, was a subject of vigorous dispute by the parties to this appeal. It requires a considerable amount of interpretation to reach the conclusion that solvents should be included within the scope of the statute, and it is questionable whether one would reach that conclusion at all without the benefit of the presumption that great weight is to be accorded the agency's interpretation of its statutory mandate. It is precisely that exercise of agency expertise, its informed discretion, that led the FEA to conclude that solvents should be regulated if the purposes of the EPAA were to be effectuated. The agency itself, prior to the institution of this litigation, clearly considered its regulation of solvents an exercise of discretion rather than a discharge of ministerial obligation.[1]

---

1. The affidavit of J. Lisle Reed, director of the Office of Oil and Gas for the FEA, submitted by the agency to the district court in support of its motion for summary judgment, makes this obvious:

While the EPAA seems to impose a mandatory duty on the President to regulate the price of "each refined petroleum product," the scope of that phrase is so ambiguous as to necessarily invest the agency with a certain amount of discretion in determining precisely what products are subject to regulation. That discretion is not transformed into a mandatory duty merely by virtue of its exercise, particularly when, as Getty contends is the case here, that discretion is sought to be exercised retroactively.

The cases cited by the majority provide little support for the existence of such a mandatory duty in the context of this case. In *Consumers Union of U. S., Inc. v. Sawhill,* 512 F.2d 1112 (Em.App.1975), *vacated,* 525 F.2d· 1068 (Em.App.1975), this court considered the question whether the EPAA imposed upon the agency a mandatory duty to regulate the price of crude oil and whether that obligation was validly discharged by permitting "new oil" to be sold at the market price. In the first opinion of the court, it was held that the agency had failed to perform its duty in setting the price of new oil at the market level. A rehearing *en banc* was granted, however, and this court held that the agency had acted within the scope of its discretion in regulating the price of new oil with reference to the free market.

Even the initial decision in *Consumers Union,* however, did no more than direct the agency to establish a ceiling price. It did not even hint that the agency, having failed to place a ceiling on the price of new oil, could, by virtue of its mandatory duty to do so, retroactively impose such a ceiling and seek to collect the "overcharges" from every crude oil producer in the country.

*Mobil Oil Corp. v. FEA,* 566 F.2d 87 (Em. App.1977), provides even less support for the majority. *Mobil* upheld the right of the agency to regulate the price of natural gas liquids against the challenge that the EPAA was not intended to apply to such products. This court found natural gas liquids to come within the scope of the term "refined petroleum products," but there was no indication that the agency was under a mandatory duty to regulate in this area. On the contrary, the basis of the decision in *Mobil* was this court's recognition that Congress intended to grant the agency broad discretion in carrying out its mandate and that the agency was empowered to decide, subject to judicial review, which products it was necessary to regulate.

This court has explicitly recognized that the agency has been assigned a task of such enormity that Congress must have intended it to devise a wide range of reasonable means for carrying out its statutory duty. *See Marathon Oil Co. v. FEA,* 547 F.2d 1140 (Em.App.), *cert. denied,* 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 378 (1977). That recognition cannot be squared with the majority's apparent conclusion that the agency's failure to promulgate a particular regulation does not relieve an oil refiner of the

During the drafting of the regulations, I paid special attention to determining precisely the scope Congress intended the FEO to give to the term "refined petroleum product" in the EPAA. Section 3(5) defined "refined petroleum product" to include "gasoline, kerosene,. distillates (including Number 2 fuel oil), LPG, refined lubricating oil and diesel fuel." It was my belief, based on my reading of the legislative history of the EPAA and my knowledge of the petroleum industry generally, that the Congress did not intend this list to be all-inclusive, and that the Congress expected the President to exercise judgment in determining which products Congress intended to have subject to regulation under the EPAA. (R. 205–06).

In addition, when drafting the initial allocation regulations I became convinced that it was necessary to regulate petroleum solvents in order to effectuate several of the statutory objectives in section 4(b)(1) of the EPAA. In particular, while I was drafting portions of FEO's initial mandatory allocation regulations, I was informed by a representative of the Department of Agriculture that shortages of certain solvents . . . were developing and that such shortages threatened to disrupt soy bean oil processing and other food processing industries dependent upon such solvents. I believed that FEO's failure to allocate solvents could have made it impossible for FEO to meet the objective in section 4(b)(1)(C) of the EPAA to maintain agricultural operations and services related directly thereto. (R. 208).

duty to follow such non-existent regulation since the agency had no choice but to issue such a regulation.

If the price of solvents was subject to controls during the period of time relevant to this appeal, then those controls must be found in the agency's regulations, not in the agency's assertedly mandatory duty to issue such regulations. While the majority dismisses appellant's attack on the regulations, even the agency concedes that the pricing regulations, by their literal terms and without any need on Getty's part to resort to hypertechnical obfuscation, simply failed to cover solvents. It may well be that the agency *intended* to draft regulations covering solvents, but the plain fact is that it did not do so.

The agency argues, however, that Getty was on notice of the regulation of the price of solvents by virtue of the inclusion of solvents in the allocation regulations.[2] The fact that a certain product is covered by the allocation regulations, however, does not lead inexorably to the conclusion that such product is also covered by the agency's pricing regulations. Some products have in fact been intentionally subjected to one set of controls but not the other.[3] More significant, perhaps, since the question before this court is the degree of notice Getty should be presumed to have received from the allocation regulations, is the fact that counsel for neither Getty nor the agency

could state with certainty at oral argument whether the pricing and allocation regulations have always been precisely parallel. The agency argues that Getty should have read the regulations as a whole and thus realized that since solvents were subject to allocation controls they were also subject to price controls. Such an argument loses considerable force when counsel for the agency cannot say whether any products have ever been subject to only one set of regulations.

While this court has wisely declined to hold the agency to a standard of "technical absolutism," *California v. Simon*, 504 F.2d 430, 439 (Em.App.), *cert. denied*, 419 U.S. 1021, 95 S.Ct. 496, 42 L.Ed.2d 294 (1974), the agency has not been granted carte blanche to ignore required procedures, particularly where such procedures are viewed as essential to the fair treatment of regulated parties. *See Shell Oil Co. v. FEA*, 574 F.2d 512 (Em.App.1978). The agency's failure to include solvents in its pricing regulations for the period of time relevant to this case cannot, in fairness to Getty, be cured in the manner approved by the majority. I would reverse the judgment of the district court.

---

**2.** Dicta supporting such a proposition may be found in *National Helium Corp. v. FEA*, 569 F.2d 1137, 1145 n. 17 (Em.App.1977). *National Helium*, however, dealt with the effect of pricing regulations which, while admittedly vague and ambiguous in their coverage of natural gas liquids, could in fact be read to apply to such products. This court merely noted that, in view of the clear coverage of the products in the allocation regulations, "National . . . should have expected the application of price regulations as well." *Id.* Such an expectation

may have been reasonable in *National Helium*, where it could be used to cure an ambiguity in the regulations: I fail to see in what manner such an expectation can be attributed to Getty, when the pricing regulations, without ambiguity, simply failed to cover solvents.

**3.** Naphthas used as synthetic natural gas feedstocks, for example, are presently subject to allocation but not price controls. 10 C.F.R. § 210.35(d)(1) and (2).