RIPPLE, Circuit Judge.
Jennings Water, Inc. (Jennings) filed this suit seeking preliminary and permanent in-junctive relief to prevent the City of North Vernon from finishing a water pipeline and commencing water service to CSL Utilities, Inc. and CSL Community Association, Inc. (hereinafter referred to jointly as “CSL”) intervened as defendants. Jennings’ action alleged that a water purchase agreement between CSL and North Vernon violated 7 U.S.C. § 1926(b). The district court granted Jennings’ summary judgment motion and enjoined the defendants. Jennings Water, Inc. v. City of North Vernon, 682 F.Supp. 421 (S.D.Ind.1988) (judgment and entry); R. 69 [hereinafter Entry]. CSL timely appealed the district court’s judgment; North Vernon does not appeal. We now affirm the judgment of the district court.
I
BACKGROUND

A. Facts

Jennings is a rural, not-for-profit water association operating in Jennings County, Indiana. See 7 U.S.C. § 1926(a)(1).[1] It was formed in 1975 and became operational upon its merger with two local rural water companies, Geneva Township Water Corp. (Geneva) and Muscatuck Water, Inc. (Mus-catuck). R. 32 at Ex. 2; R. 66 at Ex. 5. Both the Geneva and Muscatuck systems were financed by loans from the United States Farmers Home Administration (FmHA). R. 32 at Ex. 2. In October 1977, Jennings itself obtained an additional loan from the FmHA to connect and expand water treatment, storage, and distribution facilities “to supply present and future needs” of the county’s rural population. *313 Id. See also id. at Ex. 8, 9. The term of the loan is forty years; Jennings’ current total outstanding debt to the FmHA is just under $1.5 million.
CSL is a private, not-for-profit utility company formed in 1974. CSL distributes the water it buys from Jennings to CSL’s only customers — the residents of Country Squire Lakes, a subdivision in Geneva Township, Jennings County. CSL does not have its own wells or reservoirs and has always purchased water wholesale from other public utilities. Originally, CSL was supplied by Geneva, R. 29 at Ex. B; since Geneva’s merger into Jennings, CSL has purchased all its water from the successor firm. Affidavits and exhibits submitted by the parties reveal that Jennings currently serves approximately 2000 rural customers, that CSL is Jennings’ major wholesale purchaser, and that CSL in turn distributes the water it buys from Jennings to approximately 1150 customers in the Country Squire Lakes subdivision — 800 permanent and 850 seasonal residents.
The record reflects a turbulent relationship between Jennings and CSL dating back to the 1977 FmHA loan to Jennings. First, CSL refused to sign a $100,000 water user agreement that the FmHA had initially required as a condition precedent to making the loan. See R. 31 at Ex. E, F; R. 32 at Ex. 3.[2] CSL simply continued to purchase water from Jennings on a month-to-month basis. Second, in August 1980, Jennings threatened to cut off CSL’s water supply by filing a state-court action that sought a declaration that Jennings had no obligation to continue serving CSL. R. 66 at Ex. 7. According to James Rupel, president of CSL, the purpose of this declaratory judgment suit was to force CSL to sign a water user agreement under Jennings’ terms. Rupel Deposition at 110.[3] Third, in July 1986, upon learning that Jennings planned to increase its wholesale water rate, CSL notified Jennings that it would seek other sources of water supply. Jennings made no objection to CSL’s proposed action. In March 1987, the Public Service Commission of Indiana approved a substantial rate increase for Jennings. R. 55 at Ex. I. In response, CSL decided to sever its relationship with Jennings and seek another supplier. CSL then entered into an agreement to purchase water from a nearby municipality — -North Vernon, Indiana— and accordingly planned to hook up the two water systems.
Jennings was fully aware of CSL’s decision to commence purchasing water from North Vernon. After the issuance of a public notice, the Jennings County Commissioners had granted the necessary easements to CSL, and CSL had signed a water user agreement with North Vernon. Jennings still did not object.[4] Indeed, not only was Jennings cognizant of CSL’s plan, but Jennings also actively expedited completion of the CSL-North Vernon systems connection by ordering its employees to mark its water lines so as to allow CSL to lay and connect its own water mains with those of North Vernon. By August 1987, CSL was busy constructing its $71,000 connection pipe.
On September 30, 1987, however, after contacting FmHA officials and notifying them of CSL’s actions, Jennings was advised to determine whether the impending loss of CSL as a wholesale customer would significantly affect its revenue. See R. 27 at Ex. 9. Three weeks later, Jennings filed this action against North Vernon to block the completion of the CSL-North Vernon pipe and the sale of water by North Vernon to CSL. See R. 2; 7 U.S.C. § 1926(b). Jennings alleged that the CSL-North Ver *314 non water purchase agreement violated section 1926(b) and that, if CSL “is allowed to hook onto the City’s water main for purposes of purchasing water from the City ..., then Jennings Water will suffer irreparable damages by reason of jeopardizing its ability to pay the Farmers’ Home Administration.” R. 2 at 2, II7.

B. District Court Opinion

After allowing CSL’s intervention, the district court granted emergency relief to CSL. It ordered that the connection line between CSL and North Vernon could be completed and that CSL could purchase enough water from North Vernon as may be necessary to test, sterilize, and back-flush the connection. R. 13. Both Jennings and CSL then filed cross-motions for summary judgment. After the submission of affidavits, depositions, and documents, the district court granted summary judgment to Jennings.
The court determined that Jennings is a rural water association indebted to the FmHA. It then concluded that, accordingly, section 1926(b) operated to forbid the sale of water by North Vernon to CSL, because “Jennings’ loss of CSL as a major wholesale customer would curtail or limit the service that Jennings has been providing the Country Squire Lakes area in Jennings County.” Entry at 5. Additionally, the district court rejected CSL’s argument that Jennings’ conduct in the months preceding the lawsuit equitably estopped Jennings from raising any objections to the planned CSL-North Vernon water connection. Under the rule that equitable estop-pel cannot apply to block the application of a statute enacted to protect the public interest, the court ruled that Jennings was not estopped from filing suit under section 1926(b). Entry at 10-11. After making these determinations, the district court granted summary judgment to Jennings.
II
ANALYSIS
In granting summary judgment to Jennings, the district court interpreted section 1926(b) as absolutely prohibiting a municipality like North Vernon from curtailing the area served by a rural water association indebted to the FmHA. CSL submitted as its primary argument before the district court, and reasserts here, that the doctrine of equitable estoppel prevents Jennings from invoking section 1926(b). We shall first examine section 1926(b) and then determine whether Jennings is equitably estopped from invoking that provision.
A. Section 1926(b)
As in all cases of statutory interpretation, the starting point for our analysis is the plain language employed by Congress. See Indiana Port Comm’n v. Bethlehem Steel Corp., 835 F.2d 1207, 1210 (7th Cir.1987). The statute states that:
The service provided or made available through any such association shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body, or by the granting of any private franchise for similar service within such area during the term of such loan; nor shall the happening of any such event be the basis of requiring such association to secure any franchise, license, or permit as a condition to continuing to serve the area served by the association at the time of the occurrence of such event.
7 U.S.C. § 1926(b). The statute explicitly prohibits municipal encroachment on a rural water association’s service area by means of annexation or grant of private franchise. The district court interpreted section 1926(b)’s ban on “curtailment” as encompassing not only a municipality’s use of annexation or condemnation powers but also its contracting to sell water to a customer served by the association. To examine this interpretation of section 1926(b)’s breadth, we turn to the statute’s legislative history and earlier judicial interpretations.
Section 1926(b) was enacted as part of a federal statutory scheme to extend loans to certain associations providing water service or management, soil conservation practices, or other essential community services to *315 rural residents. See Glenpool Utilities Auth. v. Creek County Rural Water Dist., 861 F.2d 1211, 1214 (10th Cir.1988). The statute’s legislative history confirms that the Congress intended a broad reading for section 1926(b); the Senate report states that:
This section would broaden the utility of this authority somewhat by authorizing loans to associations serving farmers, ranchers, farm tenants, and other rural residents. This provision authorizes the very effective program of financing the installation and development of domestic water supplies and pipelines serving farmers and others in rural communities. By including service to other rural residents, the cost per user is decreased and the loans are more secure in addition to the community benefits of a safe and adequate supply of running household water. [Section 1926(b) ] has been added to assist in protecting the territory served by such an association against competitive facilities, which might otherwise be developed with the expansion of municipal and other public bodies into an area served by the rural system.
S.Rep. No. 566, 87th Cong., 1st Sess., reprinted in 1961 U.S.Code Cong. & Admin. News 2243, 2309; see also id. at 2305. All five federal courts that have reviewed section 1926(b) have concluded that the provision should be given a liberal interpretation that protects rural water associations indebted to the FmHA from municipal encroachment. See Glenpool, supra; City of Madison, Miss. v. Bear Creek Water Ass’n, 816 F.2d 1057 (5th Cir.1987); Pinehurst Enters. v. Town of Southern Pines, 690 F.Supp. 444 (M.D.N.C.1988); Moore Bayou Water Ass’n v. Town of Jonestown, 628 F.Supp. 1367 (N.D.Miss.1986); Rural Dist. No. 3 v. Owasso Utilities Auth., 530 F.Supp. 818 (N.D.Okla.1979).
In Bear Creek, the Fifth Circuit affirmed a district court injunction enjoining a city from condemning the rural association’s facilities located within city limits. After determining the purposes of section 1926(b) to be the (1) encouragement of rural water development by expanding the number of potential users, and (2) safeguarding of the financial viability of rural associations and FmHA loans, the court held that:
The statute unambiguously prohibits any curtailment or limitation of an FmHA-in-debted water association’s services resulting from municipal annexation or inclusion. This language indicates a congressional mandate that local governments not encroach upon the services provided by such associations, be that encroachment in the form of competing franchises, new or additional permit requirements, or similar means. To read a loophole into this absolute prohibition, as Madison would have us do, and allow a city to do via condemnation what it is forbidden by other means, would render nugatory the clear purpose of § 1926(b).
816 F.2d at 1059 (emphasis supplied). Accordingly, the court concluded that section 1926(b) precluded the municipality from condemning the association’s facilities, despite condemnation not being explicitly listed in the statute’s prohibition. Id. The court in Moore Bayou, also rejecting a municipality’s encroachment on a rural association’s service by means of eminent domain, similarly construed section 1926(b) as broad and absolute. 628 F.Supp. at 1369-70. See also Glenpool, 861 F.2d at 1214; Pinehurst Enters., 690 F.Supp. at 451 (section 1926(b) “unambiguously prohibits any curtailment or limitation of an FmHA indebted association’s service”) (emphasis removed). Under facts similar to this case, the Owasso court rejected a municipality’s encroachment by means of expanding its water sales to consumers located within the rural association’s territory and said that section 1926(b) limits the ability of municipalities to sell water when such sales “result in competition with a Rural Water District.” 530 F.Supp. at 824. Like Owasso, the district court here properly ruled that section 1926(b) prevented North Vernon from selling water to CSL.[5]
*316 B. Equitable Estoppel
Given this reading of section 1926(b)’s prohibition, we must now decide whether Jennings can avail itself of the statute’s protection and prevent CSL from buying water from North Vernon. CSL submits that, under the facts of this case, Jennings is estopped from invoking section 1926(b). See Appellants’ Br. at 27-49. As the district court noted, as a general principle, “[t]he doctrine of equitable estoppel, like other principles of equity, will be applied flexibly by a federal court to achieve fairness and avoid injustice.” Entry at 10; see Heckler v. Community Health Serv. of Crawford County, Inc., 467 U.S. 51, 59, 104 S.Ct. 2218, 2223, 81 L.Ed.2d 42 (1984). Whether facts proven are sufficient to constitute an estoppel is a question of law properly before this court for review. Prize Steaks Prods. v. Bally’s Tom Foolery, Inc., 717 F.2d 367, 370 (7th Cir.1983) (citing J.H. Cohn & Co. v. American Appraisal Assoc., 628 F.2d 994, 1000 n. 7 (7th Cir.1980)); see also Edgewater Hosp., Inc. v. Bowen, 857 F.2d 1123, 1137 (7th Cir.1988) (applicability of equitable estoppel “raises a question of law in the use of the doctrine of equitable estoppel”).
In this case, the district court did not find it necessary to decide definitively whether, if the traditional private party litigation model were applicable, the defense of equitable estoppel would be available to CSL. Rather, as we shall discuss in detail later, the district court believed that the defense of equitable estoppel was not available because it would be in derogation of the public policy embodied in section 1926(b). Nevertheless, we believe that, as a threshold matter, CSL presents, at best, a rather weak case for the application of equitable estoppel under any circumstances. The basic elements of equitable estop-pel have been set forth before in this circuit:
(1) “a showing of the plaintiff’s actual and reasonable reliance on the defendant’s conduct or representations” and (2) “evidence of improper purpose on the part of the defendant or of the defendant’s actual or constructive knowledge of the deceptive nature of its conduct.”
Mull v. Arco Durethene Plastics, Inc., 784 F.2d 284, 292 (7th Cir.1986) (quoting Naton v. Bank of California, 649 F.2d 691, 696 (9th Cir.1981)). In determining whether the reliance was “reasonable,” a key inquiry has been whether that party invoking the estoppel “lacked knowledge and the means of knowledge of the truth as to the facts in question.” 28 Am.Jur.2d Estoppel and Waiver § 80 at 720 (1966) (footnote omitted). On the record before us, it is undisputed that CSL was aware of the fact that the Jennings system was financed through a FmHA loan. CSL can therefore be assumed to have known that its participation in the water system was subject to the constraints of section 1926(b) — constraints hardly waivable by Jennings. Indeed CSL should have understood that it arranged for water service from others at its peril — the peril that, at any time, the FmHA might bring suit to enforce section 1926(b). “Actual or constructive knowledge of the true state of affairs will defeat the reasonableness of the reliance.” Woodstock/Kenosha Health Center v. Schweiker, 713 F.2d 285, 290 (7th Cir.1983). Certainly, if reliance is unreasonable because the regulations are published in the Federal Register, the same result ought to apply in the face of a federal statute. See Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384-85, 68 S.Ct. 1, 3-4, 92 L.Ed. 10 (1947) (“Just as everyone is charged with knowledge of the United States Statutes at Large, Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents.”). It is also not irrelevant that, as far as the record shows, Jennings *317 never specifically advised CSL that it could proceed without fear of the statute. The absence of such assurance makes the case for equitable estoppel even weaker.
As we have noted in the foregoing discussion, the district court did not rest its decision regarding the unavailability of equitable estoppel on the basis of the private litigation model. Rather, it held that the private litigation model was not applicable because equitable estoppel, applied here, would “block the application of a statute enacted to protect the public interest.” Entry at 10. The district court was correct in its conclusion, and its reasoning was both succinct and comprehensive. In reaching its conclusion, the district court relied upon the Supreme Court’s opinion in Scott Paper Co. v. Marcalus Mfg. Co., 326 U.S. 249, 66 S.Ct. 101, 90 L.Ed. 47 (1945). There, the Court, through Chief Justice Stone, stated the principle:
For no more than private contract can estoppel be the means of successfully avoiding the requirements of legislation enacted for the protection of a public interest.... The interest in private good faith is not a universal touchstone which can be made the means of sacrificing a public interest secured by an appropriate exercise of the legislative power.
326 U.S. at 257, 66 S.Ct. at 105 (citations omitted). In Scott Paper, the Supreme Court ruled that, in suits between private parties, traditional equitable estoppel may not always be available when the plaintiffs cause of action is based on a federal statute. The Court there held that the assign- or of a patent cannot be estopped (due to the contract of assignment) from producing the device once the original patent expired. Id. at 249, 66 S.Ct. at 101. To rule otherwise, held the Court, would allow a private agreement to trump the interests of public policy, as manifested in the federal patent laws, that the terminable monopolies of patents should eventually end after a fixed time. Id. at 257, 66 S.Ct. at 105; see also Diamond Scientific Co. v. Ambico, 848 F.2d 1220, 1223-27 (Fed. Cir.) (applying Scott Paper in a similar patent-assignor fact situation), cert. dismissed, — U.S. -, 109 S.Ct. 28, 101 L.Ed.2d 978 (1988); Getty Oil v. Department of Energy, 581 F.2d 838, 843 (Temp.Emer.Ct.App.1978) (equitable estoppel “cannot be invoked to avoid duties lawfully imposed by Congress to protect the public interest”), cert. denied, 439 U.S. 1070, 99 S.Ct. 840, 59 L.Ed.2d 36 (1979); United States v. Consolidated Mines & Smelting Co., 455 F.2d 432, 446 (9th Cir.1971) (“to allow an estop-pel would frustrate the public policy of protection of Indian lands and resources ... [and] the Indian Reorganization Act”); American Surety Co. of New York v. Gold, 375 F.2d 523, 528 (10th Cir.1966) (“ ‘estoppel and waiver do not in general apply in transactions that are forbidden by statute or are contrary to public policy’ ”) (quoting Northwestern Nat’l Casualty Co. v. McNulty, 307 F.2d 432, 443 (5th Cir.1962)); Oliver v. Oliver, 185 F.2d 429, 433 (D.C.Cir.1950) (“estoppel cannot be set up in opposition to a public policy laid down by the law-making power”); Daly v. Volpe, 376 F.Supp. 987, 992 (W.D.Wash.1974) (“the doctrine of estoppel cannot be the means of successfully avoiding requirements of legislation enacted for the protection of the public interest”), aff'd, 514 F.2d 1106 (9th Cir.1975); Missouri P.R. Co. v. National Milling Co., 276 F.Supp. 367, 370 (D.N.J.1967) (policy behind Interstate Commerce Act barred assertion of equitable estoppel as defense to tariff overcharges), aff'd, 409 F.2d 882 (3d Cir.1969). Cf. Sola Elec. Co. v. Jefferson Elec. Co., 317 U.S. 173, 176, 63 S.Ct. 172, 174, 87 L.Ed. 165 (1942) (“local rules of estoppel will not be permitted to thwart the purposes of statutes of the United States”).
In this case, application of equitable es-toppel based on Jennings’ actions would allow a private contract for the sale of water between North Vernon and CSL effectively to trump section 1926(b). As discussed supra, the primary beneficiaries of section 1926(b)’s ban on association service curtailment are not the associations themselves, but rather, the FmHA and the individual rural consumers who would not have inexpensive and reliable water service without FmHA-supported rural water associations. See generally Bear Creek, 816 F.2d *318 at 1060. Accordingly, Jennings section 1926(b) action for injunctive relief cannot be barred by equitable estoppel.
C. Summary Judgment
Under Federal Rule of Civil Procedure 56, summary judgment should be granted if there exists no genuine issue of material fact. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510-11, 91 L.Ed.2d 202 (1986); Colon v. Cutler-Hammer, Inc., 812 F.2d 357, 360 (7th Cir.) (per curiam), cert. denied, 484 U.S. 820, 108 S.Ct. 79, 98 L.Ed.2d 42 (1987). Under section 1926(b), North Vernon is barred from selling water to CSL if: (1) Jennings is a FmHA-indebted rural water association, and (2) North Vernon’s proposed sale of water would limit or curtail the “service provided or made available through” Jennings. See 7 U.S.C. § 1926(b). Conceding the former element, the appellants submit that an unresolved issue of fact nevertheless remains with regard to the latter. Namely, CSL posits that a dispute exists as to whether Country Squire Lakes is within Jennings’ service area, precluding summary judgment. See Appellants’ Br. at 49-50.
We disagree. As the district court noted, section 1926(b) does not limit itself strictly to the rural association territory per se, but rather, extends the association’s protection against competition also to those to whom service is “provided or made available” through a private intermediary. Entry at 3; see also Glenpool, 861 F.2d at 1214. A plain reading of section 1926(b), together with uncontroverted evidence establishing that CSL was “served” by Jennings at the time of the 1977 FmHA loan (and for the following decade), therefore leads us to conclude that the district court did not err in granting summary judgment to Jennings.[6]
CONCLUSION
Section 1926(b) prohibits any curtailment or limitation by a municipality on the service provided by a rural water association indebted to the Farmers Home Administration. The effectuation of this public policy embodied in the statute cannot be thwarted by the principle of equitable estoppel. Accordingly, we affirm the district court’s grant of permanent injunctive relief.
Affirmed.

. The Farmers Home Administration is authorized to make loans to associations not operated for profit "for the application or establishment of soil conservation practices, shifts in land use, the conservation, development, use, and control of water, and the installation of drainage or waste disposal facilities ... primarily serving farmers, ranchers, farm tenants, farm laborers, and other rural residents, and to furnish financial assistance or other aid in planning projects for such purposes.” 7 U.S.C. § 1926(a)(1).

. The FmHA later rescinded that prerequisite and the loan was made without CSL signing a water user agreement with Jennings. See R. 32 at Ex. 4.

. The record reveals no mention of the resolution of the 1980 lawsuit. Presumably, the parties were able to overcome their differences as Jennings continued to supply water to CSL.

.Indeed, a member of the Jennings Board of Directors told Kenneth Day, president of the North Vernon Water Works Department, that "Jennings Water, Inc. did not care if Water Works Department sold water to CSL Utilities, Inc. and in fact Jennings Water, Inc. would be glad to be rid of the corporation as a customer because it was a problem and they were tired of subsidizing CSL.” R. 38 at Day Affidavit, ¶ 7.

. CSL does not appear to challenge the district court’s determination of the public policy be *316 hind section 1926(b). Rather, it distinguishes the instant case from Bear Creek, Moore Bayou, and Owasso. See Appellants’ Br. at 44-47. In submitting that Owasso was improperly applied by the district court, CSL prefers to rely on Comanche County Rural Water Dist. v. City of Lawton, 501 P.2d 490 (Okla.1972), an Oklahoma Supreme Court case distinguished in Owasso. As the Owasso court noted, however, Comanche County relied on the Oklahoma Constitution and spoke of section 1926(b) only in dicta. Such distinctions made by CSL must be rejected in light of the strong absolute language of the statute as it has been construed by the courts.

. CSL also submits that Jennings did not satisfy the criteria for injunctive relief. It emphasizes that Jennings has shown no "irreparable harm.” "[A] serious threat of irreparable injury usually must be shown on an application for a temporary restraining order or a preliminary injunction.” 11C. Wright & A. Miller, Federal Practice & Procedure § 2944 at 401 (1973) (footnotes omitted). However, “irreparable injury is not an independent requirement for obtaining a permanent injunction; it is only one basis for showing the inadequacy of the legal remedy." Id. Here, the federal statute, section 1926(b), absolutely bars any encroachment by a competing water system on a rural water system indebted to the FmHA. Injunctive relief is clearly the appropriate remedy to ensure the continued, uninterrupted service by the federally indebted entity.