**GULF OIL CORPORATION, Appellant,**

v.

**William E. SIMON, Administrator of the Federal Energy Office, Appellee.**

**No. DC–24.**

Temporary Emergency Court of Appeals.

July 29, 1974.

W. B. Edwards and Catherine C. Mc-Culley, Houston, Tex. (Francis J. Walsh, Washington, D.C., on the brief), for appellant Gulf Oil Corp.

Paul T. Michael, Atty., U. S. Dept. of Justice (Carla A. Hills, Asst. Atty. Gen., and Stanley D. Rose, Atty., Dept. of Justice, on the brief), for appellee United States.

Before HASTIE, ANDERSON and JOHNSON, Judges.

PER CURIAM:

Gulf Oil Corporation brought this suit in the District Court for the District of Columbia against the Administrator of the Federal Energy Office (hereinafter, FEO) to enjoin the mandatory allocation of crude oil and other petroleum products as prescribed in FEO regulations, originally effective December 27, 1973 and amended and implemented in January, 1974. 39 Fed.Reg. 3908. These regulations imposed upon Gulf, a producer, importer and refiner of crude oil, a duty to offer to sell a specified portion of its total supply of crude oil to other refiners, some of them its major competitors, who were less adequately supplied with crude oil. Thus, all refiners were assured sufficient crude oil to operate their refineries at a specified minimum percentage of capacity. Gulf, however, wished to realize the economic advantage of its superior supply position and its large refinery capacity by retaining and refining its entire crude oil supply.

In April, 1974 the district court found that the scheme of allocation prescribed by the regulation then in effect had a rational basis and for that reason refused to enjoin its enforcement. This appeal followed.

■ We have no doubt that the rational basis test is applicable here. *Cf.* Pacific Coast Meat Jobbers Assn., Inc. v. Cost of Living Council, Em.App., 1973, 481 F.2d 1388, 1391. FEO undertook to carry out the express mandate of Congress in section 4(a) of the Emergency Petroleum Allocation Act of 1973, 87 Stat. 627, that the President impose temporary mandatory allocations of available supplies of crude oil, residual fuel oil and refined petroleum products in amounts and at prices to be specified by regulations. At a time when this country was deprived of crude oil from important foreign sources and our total supply was substantially less than the immediate needs of refiners as well as consumers, it was not unreasonable for FEO to impose a scheme of allocation designed, among other objectives, to enable all refiners to continue in competitive operation, though the scheme required the better supplied producers and importers to offer to sell some of their crude oil to their less adequately supplied competitors. In this connection, the record indicates that only about five per cent of the total national supply of domestic and foreign crude oil had to be offered for sale under the formula devised by FEO, although an individual refiner's required offering might be larger. Moreover, that part of a refiner's supply during any quarter of 1974 which exceeded its supply during the comparable quarter of 1973, was by regulation totally exempted from the crude oil allocation program.

Gulf stresses various shortcomings and undesirable consequences of particular details of allocation as originally mandated and put into effect. Administrator Simon has countered with a detailed affidavit setting out his rationalization and justification of various provisions of which Gulf has complained. Also, acknowledging that the circumstances required hurried action without benefit of experience, FEO points out that it has welcomed constructive criticism and has undertaken from time to time to revise and improve its regulations.

■ The scheme of allocation that was challenged by Gulf's complaint was operative only from February through May, 1974. Effective June 1, 1974, the original regulations have been superseded in major part by significantly different requirements. 39 Fed.Reg. 17290, §§ 211:61–71. Gulf recognizes that the currently effective regulatory scheme is unlike its predecessor, though it characterizes it as even worse. However, the

supercession of those regulations which Gulf has challenged in its present complaint as arbitrary and unfair makes inappropriate any adjudication now of the validity of requirements no longer in effect.

█ In these circumstances Gulf seeks to avoid the legal consequences of mootness by urging that this cause be remanded to the district court for consideration whether the new and presently effective crude oil allocations are valid. We decline to follow that course. This suit sought equitable relief from particular regulations and proceeded to judgment on that controversy. If new considerations provide a basis for challenging the validity of significantly different superseding regulations that now are in effect, that can appropriately be done in a new suit. Otherwise, an unending series of post-judgment controversies about new subject matter could be litigated under the umbrella of a suit already fully considered and decided. Moreover, no major delay need result from requiring Gulf to file a new complaint. That filing should not be significantly more burdensome than an amendment of the present complaint to read as an attack upon the new regulations. And we have no doubt that the district court would move as expeditiously to hear and dispose of a new suit as it would if the new claim were presented as something added to the present suit.

We have not overlooked an argument that the controversy over the regulations under which the allocation for February through May was made is not moot because a regulation now provides that, if a producer or importer has offered but has been unable to sell to other refiners the full amount of crude oil that he is required to make available to them during a particular allocation period, he is required to make this unsold amount available as a carry-over during the next quarter. It is conceded that Gulf has such a carry-over from the February-May allocation period into the present quarter. However, the regulation also provides that any such carry-over shall

be deducted from the "total allocation obligation" for the new quarter. The foregoing may be an oversimplification but it seems to be the gist of a rather complex scheme. In any event, it is not clear that Gulf's burden of required selling is significantly enlarged beyond what it otherwise would have been for the current quarter by reason of carry-over from the preceding allocation period.

But quite apart from this, we find decisive the fact that no carry-over provision appears in the regulations that were in effect during the February-May period and are challenged in this suit. It is only the new regulations, 39 Fed. Reg. 17292, § 211.65(d)(3) & (4), issued May 10, 1974, after the district court had entered final judgment in this suit that instituted the carry-over scheme. True, the quantity of crude oil to which the carry-over obligation applies is determined by the operation of the original regulations from February through May. But since the carry-over was created by the new regulations, any dispute about the validity of that imposition is more appropriately litigated in a suit challenging the new regulations than as an issue in the present dispute concerning the old ones.

█ Separately, Gulf argues that the entire administrative scheme of mandatory allocation of crude oil is invalid because its inauguration was not attended by such a statement of its environmental impact as the National Environmental Policy Act, 42 U.S.C. § 4332, requires in connection with proposed major federal actions that significantly affect the quality of the human environment.

The allocation of all available supplies of crude oil was ordered by FEO pursuant to a determination by Congress in the Emergency Petroleum Allocation Act that immediate emergency action was necessary to avoid foreseen catastrophic nationwide consequences of a critical shortage of crude oil, residual fuel oil and petroleum products essential for domestic heating, transportation and in-

dustrial production. Beyond expressly directing the President to allocate available supplies or crude oil among refiners, Congress underscored the need for immediate action by specifying in section 4(a) of the Act that the President should promulgate regulations within 15 days after the enactment of the statute and make them effective no later than 15 days after their promulgation. Thus, a national scheme of mandatory allocation had to be operative within a few weeks after enactment of the controlling emergency legislation. Mandel v. Simon, Em.App., 1974, 493 F.2d 1239.

In contrast, the National Environmental Policy Act and implementing regulatory guidelines contemplate and require deliberate formulation of environmental studies of proposed major federal undertakings, their consideration by many concerned persons and agencies, and administrative review of comments and criticisms from various sources before a definitive environmental impact statement can issue. See 38 Fed.Reg. 20550, §§ 1500.7–11. The short period Congress allowed for the formulation and effectuation of a nationwide scheme of oil allocation would have sufficed for no more than the preliminary stages of development of an environmental impact statement.

In these circumstances, Congress must have intended that the President proceed forthwith to allocate oil supplies without the elaborate formal determination of environmental impact for which the National Environmental Policy Act provides. As one court has said, "[t]he process by which . . . [environmental impact statements] are produced and circulated is a lengthy one. To require its completion before the promulgation of an emergency temporary standard would impair the purpose . . . to provide speedy protection from grave dangers . . . ." See Dry Color Mfrs. Assn., Inc. v. Department of Labor, 3d Cir. 1973, 486 F.2d 98, 107–108.

In our present ruling, we do not consider whether or when circumstances may be such that some other regulation proposed by the Federal Energy Office must be preceded and attended by an environmental impact statement. We deal only with the allocation that is challenged in this case and the particular circumstances, including a legislative timetable, that made its effectuation lawful without an attendant environmental impact statement.

The judgment of the district court is affirmed.