**GENERAL CRUDE OIL COMPANY,**
**Plaintiff-Appellee,**

v.

**DEPARTMENT OF ENERGY,**
**Defendant-Appellant,**

and

**The United States of America,**
**Counterclaimant-Appellant.**

**No. 5–29.**

Temporary Emergency Court of Appeals.

Argued Aug. 31, 1978.

Decided Oct. 12, 1978.

Rehearing Denied Nov. 9, 1978.

Arthur E. Gowran, with whom Robert G. Heiss, Dept. of Energy, Washington, D. C., and Dina R. Lassow, Washington, D. C., with whom Dennis G. Linder and Barbara Allen Babcock, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., on brief for defendant-appellant.

James V. Carroll, III, with whom Edith H. Jones, Andrews, Kurth, Campbell & Jones, Houston, Tex., on brief, for plaintiff-appellee.

Hugh Steven Wilson, William A. Long and John S. Chang, Latham, Watkins & Hills, Washington, D. C., on brief, for Sunland Refining Corporation, amicus curiae.

Before ESTES, JOHNSON and GEWIN, Judges.

ESTES, Judge.

General Crude Oil Company (General Crude) is the owner of a 50% working interest in the Banning Lease in the West Newport Field, in Newport Beach, California, which it purchased in 1966 from G. E. Kadane and Sons (Kadane). Kadane remains a 50% working interest owner, while General Crude has been the operator of the lease since 1966. Production on the lease by Kadane began in 1948; however, due to a rapid decline in production and low estimates of ultimate oil recovery, an enhanced recovery method, in situ combustion, was begun in 1958.

In situ combustion, or fire flooding, involves the ignition and controlled burning under controlled pressure of part of the heavy crude oil in the reservoir. This process cracks the hydrocarbons into lighter fractions, thereby altering the chemical composition of the crude oil from the natural state in which it existed in the underground reservoirs. *G. E. Kadane and Sons,* 3 FEA ¶ 80,516 (December 5, 1975). The chemical change is insubstantial.

By letter of December 4, 1974, Kadane requested an interpretation of FEA pricing regulations as they applied to the production from the Banning Lease. The FEA determined that although the product might arguably satisfy the technical specifications of residual fuel oil, it had been sold to Standard Oil of California (SOCAL) as crude oil for use as feedstock and that to apply the new item price rule would require a "radical departure from the historical treatment of the Banning Lease production by Kadane itself." Interpretation No. 75–29, July 12, 1975. The interpretation was affirmed on administrative appeal by FEA's Appeal Decision and Order of December 5, 1975, which concluded that the proper classification of Kadane's Banning Lease operation under the pricing regulations is the production of domestic crude oil; that the production from the Banning Lease is "crude oil" and Kadane is a "producer" of "crude oil" within the meaning of FEA's pricing regulations. *G. E. Kadane and Sons,* 3 FEA ¶ 80,516.

General Crude sold its share of the crude oil production from the Banning Lease to SOCAL until December 1, 1973. On May 18, 1973, General Crude provided SOCAL with six months' notice of cancellation of their contract so that it might secure a higher price for its share of the Banning Lease production. On November 15, 1973, General Crude contracted with Armour Oil Company (Armour) to supply that company with residual fuel oil at a price higher than General Crude had been receiving from SOCAL. General Crude subsequently installed certain above-ground treating and blending facilities on the Banning Lease, at a cost of approximately $10,000, for the purpose of blending non-cracked reservoir fluids with the cracked product in order to produce what it called "Product 15" for sale to Armour. General Crude has priced "Product 15" under the refiner price rules in 10 C.F.R. Part 212 and since December, 1973, has sold its share of the Banning production for use as residual fuel oil. Kadane, however, has continued to sell its share of such production to SOCAL as crude oil at a price determined pursuant to the producer price rules, in accordance with its historical practice and the FEA Appeal Decision and Order in *G. E. Kadane and Sons,* 3 FEA ¶ 80,-516 (December 5, 1975). R. 344–355.

Following the issuance of a Notice of Probable Violation (NOPV) to General Crude on October 17, 1975, citing violations of the pricing regulations in 10 C.F.R. Part 212 in the pricing of "Product 15," the FEA, on May 21, 1976, issued a Remedial Order determining that "Product 15" should have been priced in accordance with the producer

price regulations. The Remedial Order was based on the findings that the product had been treated historically as crude oil, the product met the regulatory specifications for crude oil, the firm met the regulatory definition of producer in 10 C.F.R. § 212.31, and the producer pricing provisions under Part 212 were the most suitable for the proper price of the product.

The Remedial Order was affirmed on appeal upon a finding that the firm had violated Cost of Living Council and FEA pricing regulations by charging refiner prices for its share of the Banning Lease production. *General Crude Oil Company,* 4 FEA ¶ 80,552 (October 22, 1976). The FEA determined that the in situ combustion technique is a manner of extracting crude oil, rather than a refining process. The agency reasoned that even though the process produces an incidental alteration in the chemical composition of the substance, the subsequent treating and blending do not substantially alter the nature of the product after its emergence from the ground, nor do they represent the complexity and sophistication normally associated with refining.

The agency further found that the product had been treated historically as crude oil and was denominated as residual fuel oil only after the promulgation of the CLC regulatory programs.

General Crude appealed the FEA Appeal Decision and Order to the United States District Court for the Southern District of Texas, where the case was heard on the parties' cross motions for summary judgment on December 13, 1977. On March 14, 1978, the District Court entered its Memorandum Decision and Judgment granting General Crude's Motion for Summary Judgment. The court concluded that "Product 15" met the definitions of crude oil and residual fuel oil contained in 10 C.F.R. § 212.31, and that General Crude's activities in making "Product 15" should be considered refining because "General Crude changes a raw, unusable product to residual

fuel oil suitable for use by an ultimate consumer without further treatment and sells Product 15 for use as residual fuel oil." R. 1094. The District Court further found that the "FEA's decision is inherently arbitrary because it is not consistent with FEA regulations, it is directly contrary to the policy objectives of the Emergency Petroleum Allocation Act of 1973 and it contravenes Congressional intent as expressed in the EPAA." R. 1094. Upon motion of General Crude to alter or amend the judgment, the District Court, on May 12, 1978, supplemented its March 14, 1978 Memorandum with findings that the "Federal Energy Administration's finding that General Crude Oil Company is a 'producer' of 'crude oil' on the Banning Lease is not supported by substantial evidence" and that the "agency's Remedial Order to General Crude Oil Company is in excess of agency authority because it irreconcilably conflicts with agency regulations and Congressional and statutory directives, while failing to achieve any purpose entrusted to the agency." R. 1114. On April 13, 1978, the Department of Energy (DOE)[1] and the United States of America, counterclaimant, filed a notice of appeal from the final judgment entered on March 14, 1978, holding the May 21, 1976 Remedial Order and the October 22, 1976 Appeal Decision and Order invalid.

The Department of Energy states the issue on appeal as:

Whether the District Court erred in declaring invalid and enjoining the enforcement of a Remedial Order and Appeal Decision and Order issued by the Federal Energy Administration ("FEA").

and presents the following questions:

1. Whether the District Court erred in finding that the May 21, 1976 Remedial Order ("Remedial Order"), as affirmed by the October 22, 1976 Appeal Decision and Order ("Appeal Decision"), which determined that the operator of a lease using an *in situ* combustion process is subject to the producer, rather than the refiner,

---

1. Pursuant to the Department of Energy Organization Act, Public Law 95–91, August 4, 1977, 42 U.S.C. § 7101 et seq., and Executive Order

No. 12009, 42 Federal Register 46267, September 15, 1977, the Department of Energy assumed the duties and functions of the FEA.

price rules, is unsupported by substantial evidence.

2. Whether the District Court erred in finding that the Remedial Order, affirmed by the Appeal Decision, is inherently arbitrary because it contravenes the policy objectives of the Emergency Petroleum Allocation Act of 1973 ("EPAA") and the Congressional intent behind the EPAA.[2]

According to General Crude:

The issue is whether the District Court erred by declaring invalid and enjoining the enforcement of FEA's Order that would require General Crude to sell Product 15 under a "crude oil" price.

and the questions presented are:

(1) Whether the FEA's conclusion that General Crude is a "producer" of "crude oil" rather than a "refiner" of "residual fuel oil" at the Banning Lease under its regulations is unsupported by substantial evidence or exceeds the agency's authority.

(2) Whether the administrative procedures employed by FEA in handling General Crude's Remedial Order and Appeal proceedings comported with a "substantial evidence" standard of review or with constitutional due process.[3]

From 1966 through November, 1973, General Crude sold all of its crude oil production to SOCAL for use as feedstock. As required by the CLC regulations, General Crude certified to SOCAL that the Banning Lease production was crude oil. While General Crude then made a new contract with Armour Oil Company for the sale of the product as residual fuel oil, Kadane continued to sell its share of production as crude oil to SOCAL. General Crude's price increase to Armour coincided with the CLC's $1 increase in the ceiling price of old oil.

■ The petroleum industry views in situ combustion as a method of production, as Congress did in amending the Emergency Petroleum Allocation Act of 1973

(EPAA) to add § 8, 15 U.S.C. § 757 (1976 Supp.). The Conference Report to that enactment stated: "A special need to encourage expanded use of high cost, enhanced recovery techniques has led the conferees to provide that this category of production be given high priority consideration in distribution of any price increases which may be permitted by reason of the removal of the 3 percent limitation on the production incentive factor." 2 CCH Energy Management ¶ 10,521 at 10,478. In General Crude's case, the enhanced recovery method is used for the primary purpose of extracting the crude oil from the reservoir. Any alteration in the composition of the substance is merely incidental to the primary operation. Furthermore, the FEA has followed a consistent practice of focusing on business activities in determining application of its price regulations. *G. E. Kadane & Sons*, 3 FEA ¶ 80,516, *Varibus Corp.*, 4 FEA ¶ 83,152, *International Trading and Transport, Ltd.*, 3 FEA ¶ 87,031, *LaTex Barge, Inc.*, 4 FEA ¶ 87,004, and *Maurice L. Brown Co.*, 3 FEA ¶ 83,196. An examination of the firm and its activities reveals that General Crude Oil Company is a producer of crude oil or, more specifically, is engaged in the business of extracting crude oil from underground reservoirs.

■ In *Kadane, supra*, the FEA recognized that the in situ process does crack the hydrocarbons into lighter fractions and thus alters the chemical composition of the crude oil. 3 FEA ¶ 80,516. General Crude blends this cracked substance with non-cracked reservoir fluids, after which the product is transferred to a treating facility for the removal of water. As the FEA stated in its Appeal Decision and Order of October 22, 1976, these blending and treating "operations are rather rudimentary and certainly do not involve the complexity and sophistication which are usually associated with a refining process." R. 696. Since construction of the treatment facility cost the firm only $10,000, the facility "hardly represents the level of investment normally associated

---

**2.** Appellants' Brief, 1–2.

**3.** Appellee's Brief, 1–2.

with a new refinery project." R. 696. The FEA considered it to be nothing more than a filter of contaminants in preparing the oil extracted for shipment to market. The blending and treating of the cracked and non-cracked oil produced by the in situ combustion operation do not substantially change the nature of the product after its emergence from the ground and do not constitute refining within the meaning of 10 C.F.R. § 212.31.

Further support for this result can be drawn from the Congressional mandate to the FEA contained in § 8(a) of the EPAA to control all first sales of crude oil, excluding stripper well lease production: ". . . The President shall promulgate and make effective an amendment to the regulations under § 4(a) of this Act which regulation, as amended, shall establish ceiling prices (or the manner of determining ceiling prices) applicable to any first sale of crude oil produced in the United States . . . ."

▇▇▇ Section 4(b) of the EPAA lists nine objectives which the implementing regulations are to achieve "to the maximum extent practicable." Because these objectives are collective goals, they must all be balanced, and no one objective may be elevated to the level of a mandatory duty. *Pasco v. FEA*, 525 F.2d 1391, 1396–7 (Em. App.1975); *Mobil Oil Corp. v. FEA*, 566 F.2d 87 (Em.App.1977). In finding the FEA decision violative of agency regulations and EPAA policies, the District Court determined that the "FEA's decision tends to discourage expansion and continued operation of the in situ combustion project at the Banning Lease which if discontinued would result in a potential loss of 6.5 million barrels of Product 15," R. 1094. This contravenes § 4(b)(1)(D) of the EPAA, which calls for the "preservation of an economically sound and competitive petroleum industry; including the priority needs to restore and foster competition in the producing, refining, distribution, marketing, and petrochemical sectors of such industry." The District Court also found that upon termination of the in situ combustion process, the

Banning crude oil would needlessly occupy refinery space, in contrast to the § 4(b)(1)(H) and (I) objectives of economic efficiency and of minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms. The court further concluded that "Armour, an independent marketer, would be forced to withdraw from the marketing of Product 15," R. 1094, contrary to § 4(b)(1)(D), above, which also calls for the preservation of the "competitive viability of . . . nonbranded independent marketers and branded independent marketers." In making these findings, however, the District Court overlooked the objective of § 4(b)(1)(F), which provides for "equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices among all regions and areas of the United States and sectors of the petroleum industry, including independent refiners, small refiners, nonbranded independent marketers, branded independent marketers, and among all users." Clearly, the orders attacked achieve this objective.

During the administrative proceedings in this case, the FEA considered General Crude's argument that the agency's determination in the Remedial Order conflicted with national energy objectives to the extent that it would produce adverse economic consequences, including abandonment of the Banning in situ operation. In its October 22, 1976 Appeal Decision and Order, 4 FEA ¶ 80,552 at 80,714, FEA stated, inter alia:

> . . . Even if General Crude's economic predictions were accurate, they nevertheless do not furnish a basis for sustaining General Crude's assertion that the conclusions reached in the Remedial Order are erroneous. As we have already stated, the Deputy Assistant Administrator correctly concluded in the Remedial Order that the producer price rules apply in the present situation, and General Crude must comply with the Price Regulations as written. If, as the firm asserts, it will incur a hardship or inequity as a result of the proper application of the

producer rules, then the appropriate remedy lies in an Application for Exception. In fact, on September 21, 1976 the FEA granted General Crude exception relief which permits it to sell a portion of the crude oil which it produces from the Banning Lease at upper tier prices. *General Crude Oil Co.,* 4 FEA ¶ 83,104 (September 21, 1976).

Title 10 C.F.R. Part 205 provides the procedure for obtaining exception relief if a firm would suffer serious hardship or gross inequity from application of the producer price rules. As shown above, General Crude has availed itself of this procedure, *General Crude Oil Co.,* 4 FEA ¶ 83,104 (September 21, 1976). The firm was permitted to sell a portion of its production from the Banning Lease at upper-tier prices. DOE will consider exception relief in the light of the opinion in *Husky Oil Company v. Department of Energy,* 582 F.2d 644 (Em.App. 1978).

The voluminous record reveals that the most that can be fairly said of General Crude's claim of stipulations or agreements made by Ms. Linda Pence, appellants' counsel, is that Ms. Pence agreed and the agencies conceded that the oil produced at the Banning Lease was residual fuel oil in the sense that it met the definitions and technical specifications of both "residual fuel oil" and "crude oil." She did not stipulate or agree that such oil was not "crude oil" and she did not stipulate or agree that General Crude was a "refiner" of such oil under the CLC/FEA Regulations. On the contrary, she argued that the agencies correctly classified General Crude as a "producer" of "crude oil" at the Banning Lease rather than a "refiner" of "residual fuel oil" under the agency pricing regulations.

At the time Kadane discovered oil on the Banning Lease, in 1943, it was sole owner and operator of the lease. In 1966, General Crude acquired one-half of the working interest in the lease and became operator of the lease. During all of this time, every document and paper evidencing the sale and delivery of the oil production from this lease referred to it as crude oil, until after the price of such production was controlled under acts of Congress and the implementing agencies (CLC and successors, FEA and DOE). In their dealings with these agencies, both Kadane and General Crude referred to such production as "crude oil" up to the time when General Crude, then operator of the lease, decided, after oral consultation with an IRS agent,[4] to cancel its contract with SOCAL for this production as crude oil and obtain a purchaser (Armour) who could and would resell it as "residual fuel oil." The record shows that this product was crude oil, even though it also met the specifications of residual fuel oil, and that the only difference in the product resulting from the recovery processes used to extract and deliver the oil from the pre-in situ recovery technique was a change in the gravity of the crude oil from 15° to 17° API. General Crude has never operated as "what is traditionally known as a refiner in the petroleum industry." R. 272. Clearly, the FEA had a rational basis for application of the producer pricing rules to General Crude Oil Company's sale of its production from the Banning Lease.

General Crude's contention regarding the question of whether the administrative procedures employed by FEA comported with

4. Appendix "A" hereto, copy of a letter of November 9, 1973 (R. 278–279), from General Crude's attorney, James V. Carroll, III, to Darrell Chandler, vice president of General Crude, "Re: Price Controls Questions," shows General Crude's awareness that it could obtain a ruling from the Cost of Living Council on whether the Banning oil production "could be sold as a 'new item' by a 'refiner' . . . . Gary said that he thought the theory was tenable, without expressing an opinion as to whether or not it would be sustained by the Cost of Living Council. . . . He seemed to think that a sub-

stantial delay might result if the Company sought to obtain a ruling from the Cost of Living Council prior to making a sale . . . ."

Subparts A and B of Part 155 of the CLC Regulations, later FEA Regulations 10 C.F.R. §§ 205.80–205.86, contain the procedures to be used for requesting agency interpretations, which do not include oral interpretations. *Atlantic Richfield Co. v. FEA,* 556 F.2d 542, 550–551 (Em.App.1977), explains the procedure. General Crude did not request such an interpretation as did Kadane.

a "substantial evidence" standard of review or with constitutional due process is without merit. *Atlantic Richfield Co. v. FEA,* 556 F.2d 542 and cases cited in footnote 10, page 546; and see *Mapco, Inc. et al. v. Carter, et al.* (Em.App.1978), 573 F.2d 1268, cert. denied, —— U.S. ——, 98 S.Ct. 3090, 57 L.Ed.2d 1134 (1978).

■ It is well established that great deference must be accorded the interpretations of statutes, implementing regulations, and orders by the administering agency, see *Pasco, supra,* at 1400–1404; thus the judicial review of an agency decision and order is necessarily limited. As this court noted in *Pasco, supra,* at 1400:

. . . In reviewing the discharge of an agency's function in interpreting the Act, promulgating regulations thereunder and applying and enforcing such regulations, this court has recognized that where administrative control has been congressionally authorized; the "judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." *Pacific Coast Meat Job. Ass'n, Inc. v. Cost of Living Coun.,* 481 F.2d 1388, 1391 (Em. App.1973), which was quoting from *Miss. Valley Barge Co. v. United States,* 292 U.S. 282, 286–287, [54 S.Ct. 692, 78 L.Ed. 1260] . . .

This principle of deference to agency determinations was again discussed in *Cities Service v. FEA,* 529 F.2d 1016, 1026 n. 16 (Em.App.1975), where the court quoted from the Supreme Court opinion in *Railroad Com. v. Rowan & Nichols Oil Co.,* 310 U.S. 573, 580–584, 60 S.Ct. 1021, 1024–1025, 84 L.Ed. 1368 (1940):

[S]uch cases are only episodes in the evolution of adjustment among private interests and in the reconciliation of all these private interests with the underlying public interest in such a vital source of energy for our day as oil. Certainly so far as the federal courts are concerned the evolution of the formulas belongs to the Commission and not to the judiciary. . . . A controversy like this always calls for fresh reminder that courts must

not substitute their notions of expediency and fairness for those which have guided the agencies to whom the formulation and execution of policy have been entrusted. . . . It is not for the federal courts to supplant the Commission's judgment even in the face of convincing proof that a different result would have been better.

On judicial review, see the recent Supreme Court opinions in *Vermont Yankee Nuclear Power Corporation v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) and *Federal Communications Commission v. National Citizens Committee for Broadcasting et al.,* 436 U.S. 775, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978).

In *Basin, Inc. v. Federal Energy Administration,* 552 F.2d 931, 934 (Em.App.1977), this court stated:

. . . "It is a well settled principle that the courts place great weight on the interpretations given to statutes and regulations by those agencies charged with the responsibility of administering them." [citing cases]

The *Basin* opinion, at 934, *supra,* quoted the following from *Condor Operating Co. v. Sawhill,* 514 F.2d 351 (Em.App.1975), *cert. denied* 421 U.S. 976, 95 S.Ct. 1975, 44 L.Ed.2d 467:

. . . "Where the obvious intent of Congress is to give the President and his delegates broad power to do what reasonably is necessary to accomplish legitimate purposes rendered necessary by a recognized emergency, and regulations are fashioned to implement the Congressional mandate, the court should not interfere with the prerogative of the agency to select the remedy which for rational reasons is deemed most appropriate."

*Mobil Oil Corp. v. Federal Energy Administration,* 566 F.2d 87, 93 (Em.App.1977), states:

. . . Agency action taken in pursuit of a legitimate statutory goal enjoys a "presumption of validity," and he who would upset it carries a "heavy burden."

*FPC v. Texaco, Inc.,* 417 U.S. 380, 389, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974). . .

In *Pasco, Inc. v. Federal Energy Administration,* 525 F.2d 1391, 1394 (Em.App.1975), this court said:

In reviewing the exercise of that authority, it must be remembered that the "[e]xercising of the administrative authority and the accomplishment of purposes enumerated by Congress under the recognized emergency conditions are exceedingly complicated undertakings." *Condor Operating Company v. Sawhill,* 514 F.2d 351, 359 (Em.App.1975), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1975, 44 L.Ed.2d 467 (1975). The broad mandate for the equitable allocation of crude oil at equitable prices combined with the rapid rise in world oil prices left the FEA with a "gargantuan task." [6] As stated in *Con-*

[6] This phrase was similarly applied to the burden imposed on the Cost of Living Council under the Stabilization Act which, like the Allocation Act, was an extremely broad delegation of authority by Congress to the Executive Branch under recognized emergency conditions. *University of Southern Cal. v. Cost of Living Council,* 472 F.2d 1065, 1068 (Em.App. 1972).

*dor Operating Company v. Sawhill, supra,* at p. 359:

The urgency of the challenge confronting the agency upon the passage of the Emergency Petroleum Allocation Act already has been recognized.

The situation of the CLC and FEA administering the Economic Stabilization Act and the Emergency Petroleum Allocation Act of 1973, as amended, was recognized by subsequent decisions of our court in *National Helium Corp. v. FEA,* 569 F.2d 1137, 1144 (Em.App.1977), and *Getty Oil Co. v. DOE,* 581 F.2d 838 (Em.App.1978).

In *Amtel, Inc. v. Federal Energy Administration,* 536 F.2d 1378, 1383 (Em.App. 1976), this court stated:

. . . In *Consumers Union of U. S., Inc. v. Cost of Living Council,* 491 F.2d 1396, 1403 n. 2 (Em.App.1974), *cert. denied,* 416 U.S. 984, 94 S.Ct. 2387, 40 L.Ed.2d 761 (1974), this court quoted from *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491

(1970), which stated: "The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific."

By requiring the attainment of the specified objectives of the Allocation Act "to the maximum extent *practicable*" (emphasis added), 15 U.S.C. § 753(b)(1) (1976 Supp.), Congress recognized that the objectives were to a certain extent inconsistent and intended that the FEA would exercise its discretion in achieving a workable balance among them.

The District Court did not accord FEA's findings the judicial deference to which they were entitled under the law. *Southern Union Production Co. v. FEA,* 569 F.2d 1147, 1152 (Em.App.1978).

The decisions and orders of the FEA under attack were authorized by law, supported by substantial evidence, rationally based, and were not arbitrary, capricious, erroneous, or otherwise invalid.

The judgment of the District Court is clearly erroneous. It is hereby reversed and the case remanded with directions to vacate the District Court's March 14, 1978 Judgment granting plaintiff General Crude's Motion for Summary Judgment and to grant defendants' motion for summary judgment and for further proceedings consistent herewith.

IT IS SO ORDERED.

## APPENDIX "A"

November 9, 1973

Mr. Darrell Chandler
General Crude Oil Company
P.O. Box 2252
Bank of the Southwest Building
Houston, Texas 77001

Re: *Price Controls Questions*

Dear Darrell:

I spoke with Gary Dossett, Petroleum Regulations Expert at the IRS Office, regarding General Crude's proposed California fuel oil sale. I told Gary that the Company

APPENDIX "A"—Continued

recently learned that the oil satisfied the specifications for "Bunker C" or "number six fuel oil". The Company engages in a secondary recovery procedure which involves the burning of gas in the formation so as to drive oil to the other wells located at the perimeter. A result of the secondary recovery operation is to "cook" the oil and to drive off certain volatile components. As a result of this cooking operation, the oil which is produced from that field meets the specifications of number six fuel oil or Bunker C fuel oil.

I told Gary that the Company feels that it would be justified in taking the position that the oil that was produced from that field could be sold as a "new item" by a "refiner", based on the theory that the Company has changed the characteristics of the oil in connection with the secondary recovery operation and that it had produced a specification product which needed no further "refining" in order to be sold to industry as fuel oil. Gary said that he thought the theory was tenable, without expressing an opinion as to whether or not it would be sustained by the Cost of Living Council. He indicated that the Cost of Living Council had been very slow in issuing determinations requested by the Internal Revenue Service. He seemed to think that a substantial delay might result if the Company sought to obtain a ruling from the Cost of Living Council prior to making a sale under the theory underlined above.

If you have any questions regarding this matter, please contact me.

Very truly yours,

JAMES V. CARROLL, III

94/sj