MARATHON OIL CO. et al., Plaintiffs,

v.

DEPARTMENT OF ENERGY et al., Defendant,

and

Ashland Oil, Inc. (Intervenor-Defendant).

Civ. A. Nos. 79–3309 to 79–3313 and 79–3333.

United States District Court, District of Columbia, Civil Division.

Dec. 19, 1979.

R. Bruce McLean, Daniel Joseph, Warren E. Connelly, Harry R. Silver, Edward L. Rubinoff, Washington, D. C., for plaintiffs Marathon Oil Co., Mobil Oil Corp., and Atlantic Richfield Co.; Clifford Robinson, John Evans, Marathon Oil Co., Findlay, Ohio, William C. Streets, Mobil Oil Corp., New York City, Keith Clemens, Atlantic Richfield Co., Los Angeles, Cal., of counsel.

Jay L. Carlson, Edward A. Lenz, Stuart M. Bluestone, Washington, D. C., for plaintiff Exxon Corp.; John L. O'Hern, Houston, Tex., of counsel.

Robert F. Ochs, Jeffrey G. Shrader, John P. Knight, Houston, Tex., Gerald P. Thurmond, Washington, D. C., for plaintiff The Gulf Companies.

Paul G. Wallach, Deputy Gen. Counsel, U. S. Dept. of Energy, Washington, D. C., for defendants Department of Energy et al.

Fred W. Drogula, Washington, D. C., for intervenor-defendant Ashland Oil, Inc.

## OPINION

HAROLD H. GREENE, District Judge.

On November 12, 1979, the President issued a proclamation pursuant to 19 U.S.C. § 1862 banning the importation to the United States of crude oil produced in Iran. 44 Fed.Reg. 65581. The next day the government of Iran imposed an embargo on the export of its crude oil to all United States firms. Ten days later on November 23, 1979, the Economic Regulatory Administration (ERA) of the Department of Energy issued a Notice of Proposed Rulemaking in which it was stated that ERA was considering implementing its Standby Mandatory Crude Oil Allocation Program so as to mitigate possible impacts caused by the loss of Iranian oil. 44 Fed.Reg. 67602.[1]

Prior to that time, on November 20, 1979, Ashland Oil, Inc., had applied to the Office of Hearings and Appeals (OHA) of the Department of Energy for an exception in which it requested that Office to provide it with an allocation of 100,000 barrels of crude oil per day from other domestic refiners, beginning in December 1979, to replace the oil which Ashland anticipated losing from Iran. A hearing on the application was convened on November 26, 1979, and a substantial number of witnesses testified, including witnesses from several plaintiff companies. On November 27, 1979, the Director of OHA issued an order granting Ashland a temporary exception.

In taking this action, the Director concluded that there was a very substantial likelihood that Ashland would ultimately receive exception relief from OHA on the basis that it and its customers were bearing a disproportionate burden of the President's action. Specifically, the Director found that (1) as a result of that action Ashland is losing 100,000 barrels of crude oil per day, or 25 per cent of its entire supply; (2) no other firm in the United States is in a similar position as Ashland; (3) if Ashland purchased oil on the "spot" market in excess of $40 per barrel and passed the cost on to its customers, it would unfairly burden many of them; (4) without a temporary exception, Ashland would, at best, have to reduce its production of petroleum products to 75 per cent of its previous supply effective December 1, and that production would fall to between 54 and 55 per cent in January, 1980; (5) if Ashland raised its prices or reduced its allocation, its customers would face disruptions to their businesses so as to present an imminent threat of curtailment of those business activities.[2]

---

1. The sixty-day public comment period otherwise required by Executive Order 12044 was waived.

2. The record before the OHA also showed, *inter alia*, the following. Through the end of December Ashland may be expected to continue to receive Iranian oil that had been loaded before the embargo was imposed. As of December 1, 1979, it had an inventory of 18 million barrels,

and it is able to purchase foreign oil on the world spot market. However, it would cost Ashland $50 million per month, or three times its petroleum profits, to buy oil to replace its Iranian crude supplies, and it is possible that these costs could not be passed on to its customers. Without replacement crude oil, Ashland would be required either immediately to curtail its refinery operation to a 62 per cent allocation fraction or to curtail it for December

The Director further concluded that public policy supported the immediate grant of relief. He found that denial of the temporary exception would result in a more immediate hardship and inequity to Ashland and its customers than to others affected by the proceeding but, inasmuch as Ashland could supply its customers with adequate volume in December 1979, he could not conclude that Ashland would experience immediate irreparable injury.[3]

Based upon his conclusion that, on balance, Ashland had demonstrated that temporary exception relief should be granted, the Director decided that it should receive an allocation of 80,000 barrels per day from nine other refiners during December, January, and February.[4] These refiners were selected on the basis that each had a total domestic refining capacity in excess of 500,000 barrels per day.[5] He specified that the price of the oil sold to Ashland was not to exceed the weighted average F.O.B. cost of foreign crude oil purchased by the particular firm for delivery into the United States during November and December 1979, but, in addition, he allowed the cost of transportation and a profit of $1.50 per barrel.

Ashland, in turn, was required to maintain average refinery runs during December, January, and February equal to its runs during a June-through-December base period. It was also specifically required to refine 87 per cent of the gasoline refined in comparable periods of a year ago and maintain pre-crisis production levels of other fuels.

On December 9, 1979, plaintiffs filed this action for judicial review of the OHA order and for a preliminary injunction to stay the OHA action, which requires plaintiffs to begin oil shipments to Ashland as of December 20, 1979. The five complaints, involving eight oil companies, were consolidated[6] and Ashland was permitted to intervene as a defendant. Voluminous memoranda and other papers were filed by the parties,[7] and a hearing on the motion for preliminary injunction was held on December 18, 1979.

I

Both intervenor-defendant Ashland and the federal defendants have filed motions to dismiss[8] based essentially on the theory of failure to exhaust administrative remedies. Defendants argue that the Temporary Emergency Court of Appeals has consistently required the exhaustion of administrative remedies prior to judicial review,[9] and that 10 C.F.R. Part 205 provides such a remedy by allowing an administrative stay. However, another regulation, 10 C.F.R. § 205.128(g), explicitly directs that the "grant or denial of a temporary exception is not an order of the DOE subject to administrative review." Defendants' efforts to explain away the clear meaning of that regulatory provision are unpersuasive. Moreover, no case is cited where any court has required an application for a stay as a prerequisite to judicial review of the agen-

to 75 per cent with the probability of a refinery shutdown in January. In 1979 Ashland sold most of its United States and North Sea oil reserves, thereby reducing its long-term debt and achieving a substantial gain in earnings.

3. The OHA Director also concluded that it could not be known at that time whether the pending rulemaking proceeding would afford Ashland any relief.

4. Ashland is required to make up the remaining 20,000 barrels out of its own resources.

5. A number of other factors were also considered, including supplies of crude oil available to each selected refiner, and the ability of each refiner to distribute the approximate amount of refined products, especially gasoline.

6. Amoco filed a similar complaint two days later, and its case was likewise consolidated with the others.

7. Marathon Oil Company, one of the plaintiffs, has also indicated that it "reserves its right . . . to . . . argue" that the OHA order effectuated an unconstitutional taking of property without just compensation.

8. Alternatively, the motions request a stay.

9. See, e. g., American Nursing Home Association v. Cost of Living Council, 497 F.2d 909 (Em.App.1974).

cy's order. Since the agency developed a factual record, and came to a reasoned conclusion based thereon, it would make little sense to send the parties back to OHA merely to have that body's director restate his conclusions. See *Phillips Petroleum Co. v. FEA*, 435 F.Supp. 1239 (D.Del.1977).[10] Accordingly, defendants' presently pending motions to dismiss are hereby denied.[11]

## II

■ With respect to the merits, plaintiffs argue first that, while under the law adjustments to rules or regulations may be made if they would cause special hardship (see Part III *infra*), guidelines issued by OHA restrict such relief to the alleviation of problems "which have arisen as a direct result of a Department of Energy regulatory program." 41 Fed.Reg. 50856. That, claim the plaintiffs, is not the situation here, for Ashland's problems are said to be the result of (1) the President's proclamation, (2) the actions of the Iranian government, and (3) Ashland's own business decisions. These contentions, which lie at the heart of plaintiffs' substantive arguments [12] are not persuasive.

While, to be sure, the guidelines issued by the Department of Energy do not explicitly mention actions by the President with regard to energy supplies, it would be exalting appearance over substance to exclude what occurred here from the scope of the guidelines.

The President's proclamation of November 12, 1979, when viewed in conjunction with his direction to the Secretary of Energy to "ensure equitable and fair distribution of petroleum products and to ensure a minimum disruption of our Nation's economy," [13] were in the present context a part of the DOE regulatory program. Governmental policy for decades encouraged American oil companies to deal with Persian Gulf nations. As a consequence of the recent events in Iran, the President ended such commerce, and an effort is now being made to bring about some equalization of the burdens flowing from these successive government policies. The Court is not prepared to hold that under the DOE guidelines exception relief may be granted from special hardships or inequities if they are brought about directly by the Department of Energy but not if they are caused by energy actions of the President, the Department's superior.

Moreover, the Presidential proclamation must be viewed in the context of DOE's buy/sell program and the general DOE freeze rules which as a practical matter prevent Ashland from obtaining domestic oil to replace the Iranian crude. Thus, even in a more literal sense, there has been compliance with the guideline direction.[14]

Plaintiffs contend next that Ashland's supply problems were not in any event caused by the President but by the subsequent action of the Iranian government. It is not clear on what facts that conclusion is based. The President imposed a ban on the importation of oil from Iran. The following day the Iranian government, or whatever individual or group may have been exercising *de facto* authority in that country at that time, apparently proclaimed an embar-

10. Inasmuch as the DOE order imposed an immediate obligation it is judicially reviewable. See *Chicago and Southern Airlines, Inc. v. Waterman Steamship Corp.*, 333 U.S. 103, 113, 68 S.Ct. 431, 92 L.Ed. 568 (1948); *Conway Corp. v. Federal Power Commission*, 167 U.S. App.D.C. 43, 46, 510 F.2d 1264, 1267 (1975), *aff'd.*, 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976).

11. This decision is without prejudice to any subsequent dismissal on the basis of failure to state a claim on which relief may be granted or on mootness grounds.

12. Plaintiffs' procedural claims, and the claimed lack of necessity for immediate relief, are discussed elsewhere herein.

13. 15 Pres.Doc. p. 2108 (November 12, 1979).

14. Moreover, the DOE guidelines are no more than that—general guidelines to be applied in a common sense manner to specific cases. See Energy Management (CCH) ¶ 80,004 at 80,008.

go.[15] This Court has no basis for determining—as plaintiffs apparently suggest—whether or not the Iranian embargo would have been imposed irrespective of the President's actions. Much of what has occurred in Iran during the last six weeks has been baffling at best. Surely a court in this country could not properly speculate as to what might or might not have occurred absent the President's proclamation. The fact is that the President imposed his ban on the import of Iranian oil; whatever was purported to have been done thereafter in Iran with respect to the sale of oil to the United States is irrelevant to the case before the Court.

Plaintiffs finally contend on this aspect of their motion that the real cause of Ashland's problems—and that of its customers—is that company's discretionary business decision not to maintain worldwide crude oil operations, that is, to fail to develop secure sources of supply, but to rely instead upon the crude oil supplies of Iran. With respect to that decision, plaintiffs state that, "Ashland, not its competitors, must bear the consequences . . . ," and exception relief is therefore not appropriate.

When Ashland made its decisions to rely on Iran as a supplier of its crude oil, that country had previously been friendly to the United States, its government, its people, and its commerce for many decades. As OHA stated, "at the time Ashland secured those supplies, it was certainly consistent with the long-term objectives of the United States to develop productive relationships with the new Iranian government. Ashland's actions were consonant with that long-term objective of the United States, [and its decision to secure oil supplies from that country] was prudent and it was reasonable." The chaotic events of the last few weeks—which now, and for the time being at least, contradict that assessment—were apparently not foreseen by anyone, including the government of the United States.

A decision by the Department of Energy pursuant to its statutory authority to effect some sharing of the burdens arising from those events—both insofar as oil importers and their customers are concerned—is thus neither inherently unreasonable nor can it be regarded as a novel or startling departure from a business-as-usual tradition. The decision to reallocate supplies of crude as a consequence of the Iranian events is not the first governmental intervention in the oil market. The government has had a profound influence on that market, both by way of the general reallocation program described below, and by way of granting significant benefits to the oil companies (including these plaintiffs) in the form of depletion allowances, oil import quotas, tax credits, and the like. It is unfortunate that, at a time of national distress, with diminished petroleum supplies resulting from the events in Iran and elsewhere, an apparently equitable burden-sharing program should be resisted on the theory that those who relied on Iran for their oil supplies should be left to shift for themselves.[16] In any event, under the relevant statutes such a position clearly lacks merit.[17]

### III

The Department of Energy regulations provide that OHA may consider an applica-

---

**15.** Plaintiffs' suggestion that the Iranian embargo may be broader than the President's proclamation is not material to the issues—certainly not in the context of the current temporary OHA order.

**16.** It is not necessary to follow the government in its reliance on national security and foreign relations arguments to conclude that plaintiffs' position will hardly encourage the friends and allies of the United States to heed its call for sharing the burdens brought about by the oil shortage and the other problems associated with recent events in Iran.

**17.** There is an administrative precedent directly on point for the grant of relief to those who, like Ashland, rely in good faith on government policy. OHA granted a special allocation exception to the Commonwealth Refining Company (CORCO) because that company, in reliance on policy which encouraged it to establish a refinery in Puerto Rico, had located refining facilities on that island with the officially-sanctioned prospect of lower crude oil costs because of various import preferences.

tion for an exception only "when it determines that a more appropriate proceeding is not provided" under the regulations. 10 C.F.R. § 205.55(b)(1). Plaintiffs argue that the rulemaking proceeding begun on November 23, 1979, by ERA is "more appropriate" for several reasons. First, it is claimed, there is no need to take final action before January 1, 1980, and the rulemaking proceeding will be concluded by that time. Second, the rulemaking proceeding will permit an assessment of the Iranian embargo on the entire industry, and it will do so, and more appropriately so, after full participation by all potentially aggrieved parties. Third, inasmuch as rulemaking procedures have been initiated, there is no authority for OHA to have interfered at all at this time.

These arguments raised primarily the question whether immediate relief, that is, relief prior to the conclusion of the rulemaking program, was appropriate and necessary. This argument requires a discussion of the statutory framework and direction.

In 1973 Congress enacted the Emergency Petroleum Allocation Act (EPAA), 15 U.S.C. § 751 et seq. The Act was passed in response to the petroleum shortages and escalating prices due to the embargo imposed by the OPEC nations during that year. As the oil shortages increased, the major integrated oil companies—including the plaintiffs in this action—moved to cut off independent customers in order to retain for their own systems the crude oil supplies which they controlled. A voluntary allocation program proved ineffectual (see House Report No. 93–531 of the Committee on Interstate and Foreign Government, September 29, 1973, p. 10), and it was in this context that Congress imposed the EPAA on the petroleum industry, requiring the allocation of crude oil and petroleum products to assure their equitable distribution at equitable prices.

The Federal Energy Administration, as a predecessor of the Department of Energy, adopted what is commonly referred to as the Crude Oil Buy/Sell Program, 30 Fed. Reg. 17287 (May 14, 1974), which required the fifteen major integrated oil companies to sell crude oil to independent refiners like Ashland [18] and to small refiners at their weighted average F.O.B. price.[19] Thus, the general authority of the Department of Energy to allocate scarce petroleum supplies is well established. Indeed, in their Reply Memorandum, plaintiffs explicitly state that they "are not challenging DOE's right to allocate crude oil supplies."

Section 4(b)(1) of the EPAA, 15 U.S.C. 753(b)(1), includes among the objectives of the regulations to be issued pursuant to the statute the maintenance of public services, preservation of an economically sound and competitive petroleum industry, and an equitable distribution of refined petroleum products at equitable prices among all regions and areas of the United States and factors of the industry including independent refiners and marketers.[20]

Section 504 of the Department of Energy Act, 42 U.S.C. § 7194, authorizes the Secretary to make any "adjustments to any rule, regulation or order" issued under the EPAA "as may be necessary to prevent special hardship, inequity, or unfair distribution of burdens . . .. The Secretary's power to grant exceptions has been

---

**18.** Although Ashland is one of the largest oil companies in the United States, with annual sales of $6.7 billion, since, unlike plaintiffs, it does not control the sources of crude oil it needs to operate its refineries, it qualifies as an "independent refiner."

**19.** The program has been challenged, but unsuccessfully so. See *Union Oil Company v. Federal Energy Administration*, CCH Eng.Mgt. ¶ 26,007 (C.D.Calif.1974); *Gulf Oil Corp. v. Simon*, 502 F.2d 1154 (Em.App.1974); *Exxon v. FEA*, CCH Eng.Mgt. ¶ 26,013 (D.D.C.1974).

**20.** In 1977, the Buy/Sell program was limited to small refiners which had a demonstrated need for crude oil allocations based upon their inaccess to sufficient supplies of domestic and foreign crude. The buyer-seller relationships were preserved with a base date of 1976. Standby regulations are available which, when put into effect, would reimpose the stringent allocation controls over available crude supplies if and when a supply shortage develops. See Special Rule No. 10 to 10 C.F.R. 211, 44 Fed.Reg. 32198 (June 5, 1979).

delegated to the Department's Office of Hearings and Appeals (OHA) and, as indicated (text to note 14 *supra*), that Office has established general guidelines for the exercise of this authority.

OHA's procedural rules provide that an application for an exception may be considered whenever "a more appropriate proceeding is not provided" by the regulations. They further provide that the agency may in its discretion grant a temporary exception to "implement on an immediate basis any relief appropriate to the application. . . ." 10 C.F.R. §§ 205.176, 205.128(a). The criteria under which OHA considers a temporary exception are closely patterned on the criteria a court considers in granting a temporary restraining order or preliminary injunction. See 10 C.F.R. § 205.125(b). It is such a temporary exception decision which is before the Court today.

As noted elsewhere herein, Ashland had a contract with the National Iranian Oil Company to purchase 100,000 barrels of crude oil per day, approximately 25 per cent of the company's supply. As a result of the President's proclamation, that source of supply was completely cut off.[21] Plaintiffs argue, however, that no immediate emergency exists and that the OHA order is premature because the last shipments of Iranian oil from vessels that had already been loaded at the time of the Presidential proclamation are scheduled to land in the United States in the first week of January 1980. The Court cannot agree with that analysis.

Ashland is faced with the choice of either continuing to distribute its supplies at its current regular rate in December or beginning to stretch out those supplies immediately even though the last of the tankers bearing Iranian oil has not yet landed. A continuation of the present rate of production would enable the company to produce 75 per cent of the gasoline it had produced in December of last year. However, in that event its inventories would be reduced to

the point where in January of 1980 it could produce only 54 per cent of the gasoline it had produced in January of 1979, and it would have to close one of its refineries in February 1980. The Department of Energy considered that, on balance, it was a prudent policy decision of Ashland not to deplete its supplies in December, and the Court is unable to conclude that this assessment is wrong.

Plaintiffs argue that with respect to the month of December Ashland in effect has an assurance that it will have adequate future supplies and that with respect to January and February relief is premature, all because the ERA has allegedly indicated that it will complete its rulemaking proceeding by January 1, 1980. However, a reading of the record demonstrates that there is no assurance that the proceeding will be completed by that date, let alone that it will be concluded favorably to Ashland. Without an assurance of a more permanent solution to Ashland's shortage problem, Ashland would either have to curtail its operations (with the injury to the company and its customers that is detailed elsewhere herein) or to begin immediately very costly purchases on the crude oil spot market. OHA determined that section 504 was an appropriate basis for the grant of an exception to relieve Ashland of that special hardship and unfair distribution of burdens and for the reasons stated, its decision cannot be regarded as arbitrary and capricious concerning either the December or the January-February period.

It is thus clear from the statutory and regulatory pattern as well as the record (1) that the allocation of petroleum supplies is authorized; (2) that temporary exception and relief may be granted under emergency circumstances; and (3) at least for present, preliminary injunction purposes, that the agency having jurisdiction—OHA—has validly found that such circumstances were present here.

21. Prior to the President's announcement, Ashland had been able to distribute 87 per cent of the motor gasoline that it had distributed during the commensurate period in 1978 and 96 per cent of the middle distillates.

The Court's function on judicial review is limited. Section 211(d)(1) of the Economic Stabilization Act, which is incorporated in section 5 of the EPAA, provides that no order of an agency shall be enjoined unless it "is in excess of the agency's authority, or is based upon findings which are not supported by substantial evidence." See generally, *Chrysler Corp. v. Dunlop*, 490 F.2d 985, 988 (Em.App.1973); *Pasco, Inc. v. FEA*, 525 F.2d 1391, 1400–1404 (Em.App.1975); *General Crude Oil v. DOE*, 585 F.2d 508, 515 (Em.App.1978); *Carlos R. Leffler, Inc. v. FEA*, 455 F.Supp. 623, 624 (D.D.C.1976); *Powerine Oil Company v. FEA*, 536 F.2d 378, 386 (Em.App.1976). Plaintiffs have failed to meet that standard and they are unlikely to prevail on the merits.

### IV

Two separate yet substantively related arguments made by plaintiffs must be considered next. It is contended by the plaintiffs, and not denied by the government and the intervenor, that there were *ex parte* communications between Ashland and the Department of Energy at the initiation of the OHA proceeding. There is a dispute about the extent and the substance of those contacts but they apparently included at least a minimal discussion of the proof Ashland would produce during the OHA hearing. Plaintiffs also argue that because of the congressional preference for rulemaking and the substantive scope of the OHA order that order was improper because it intruded into an area more validly left for more formal procedures.

For the reasons discussed *supra*, the Court has concluded that in view of the patent emergency to which the OHA proceeding was addressed and its relatively limited duration the order issued by that body was appropriate and valid. However, both the Department of Energy and Ashland have suggested that OHA could proceed, again and again, to provide exception relief to Ashland and perhaps others as long as the grant of such relief was not inconsistent with a specific rule adopted by the ERA. In the view of the Court, it seems clear that OHA exception relief must be limited to exceptional circumstances, and that when the exception becomes the rule, rulemaking is the appropriate method— with all of the procedural safeguards attendant thereto—by which the Department of Energy would generally have to proceed.

Rulemaking is especially appropriate here because of the claim made by plaintiffs that Ashland is in effect seeking to insulate itself from the expensive spot market for crude by refusing to alleviate the hardships to it and its customers through purchases in that market, thus forcing the government to intervene and provide it with less expensive supplies. Ashland's competitors, it is said, are not acting in similar fashion.

A rulemaking proceeding could appropriately examine the extent to which as a matter of deliberate governmental policy Ashland and others affected by the Iranian cut-off should or should not hereafter be required to acquire petroleum supplies on the free market as distinguished from acquisition through government reallocation. Obviously that kind of decision should not and could not be made, except on an isolated emergency basis, by the OHA. Thus, while the Court's decision today is premised on the conclusion that plaintiffs are not likely to prevail on the merits of their challenge to the current OHA order, that decision should not be regarded as an endorsement of possible OHA action on a longer-term basis with more lasting policy implications.

### V

What remains to be considered are the relative injuries and the public interest. The injury to Ashland from a suspension of the governmental program to reallocate supplies has already been discussed above. Additionally, the record before OHA shows immediate and substantial injury to many of Ashland's customers. If Ashland is granted no relief, several independent gasoline customers of Ashland in the Midwest will have to close their stations and lay off many of their employees. It may likewise be expected that industries and small busi-

nesses will have to be closed in the Appalachian region, and supplies of heat to homes in that area will have to be curtailed or ended. Northwest Airlines, which receives over 43 per cent of its fuel requirements at Minneapolis-St. Paul from Ashland, will be forced to curtail service by approximately 17 per cent, and Midway Airlines, which receives 100 per cent of its fuel from Ashland, will be forced to ground one-third of its fleet. The Chessie System Railroad, which receives approximately 25 per cent of its fuel from Ashland, will be forced to disrupt its freight schedules with resulting curtailment of coal production in Appalachia. According to the Director of the West Virginia Energy and Fuel Office, if Ashland receives an allocation of only 62 per cent, "there is no way that our coal industry is going to be able to survive." Ashland supplies around one-quarter of West Virginia's heating oil, kerosene, and gasoline with potentially disasterous consequences this winter in the event of an oil cut-off. Somewhat similar consequences may be expected in Minnesota.

Unquestionably, plaintiffs, too, will suffer some injury as a result of the enforcement of the Department of Energy order, since they will have to divert some crude oil stocks to Ashland.[22] This, as they point out, will mean that they will either have to replace the oil so diverted with more expensive spot market crude, reduce allocations to existing customers, or replace the products that would be derived from the crude sold to Ashland.[23]

However, it is perfectly obvious, and the record shows, that plaintiffs' injuries in that regard are infinitesimal compared to those of Ashland and its customers. In 1978, plaintiffs had combined sales of $208 billion, profits of $9.6 billion, and a net worth of $74.8 billion. Under the OHA order, their refinery runs will be reduced by from 0.6 to 1.7 per cent and their losses, assuming that they are not compensated therefor in the event they ultimately prevail here or before the administrative agency (but see *infra*) range from 0.14 to 0.92 of their projected 1979 profits. Ashland, on the other hand, as previously noted, is presently losing 25 per cent of its oil supply,[24] and its customers may well be crippled unless emergency action is taken. To the extent that reductions in sales or purchases in the spot market will be necessary, the problem will obviously be far more manageable to the nine plaintiffs than to Ashland.

Moreover, under the standard of the *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 182 U.S. App.D.C. 220, 559 F.2d 843 (1977) and *Virginia Petroleum Jobbers Ass'n. v. FPC*, 104 U.S.App.D.C. 106, 259 F.2d 921 (1958), the burden is on plaintiffs to demonstrate irreparable injury. As noted, when the injuries are balanced it immediately becomes clear that, relatively speaking, those which are inflicted on plaintiffs by the order of the Department of Energy are slight. Moreover, these injuries are not irreparable by any means. See *Exxon Corporation v. FEO*, CCH Eng.Mgt. ¶ 26,013 (D.D.C. 1974).[25] They are merely financial and can be repaired in the future by financial means. The Department of Energy has the authority to order Ashland to sell crude oil back to plaintiffs in the event plaintiffs ultimately prevail in the administrative pro-

**22.** There is a dispute on the question of whether such stocks exist or whether plaintiffs would have to purchase supplies on the spot market. For present purposes it may be assumed that the latter is correct.

**23.** It might be added that they would forfeit the opportunity to take over some of the markets which Ashland would have to abandon for lack of crude.

**24.** Ashland has been unable to purchase crude oil scheduled to be loaded on tankers beginning November 17, 1979. It lost 900,000 barrels of

crude oil that day; 1,575,000 barrels on November 20; and 900,000 barrels on November 21.

**25.** The Court does not agree that Judge Robinson's opinion in that case has been eroded by changed conditions, for plaintiffs can in all likelihood still pass through increased crude oil costs, and if they cannot, they may subsequently be made whole by DOE. See *infra*. By contrast, the various decisions cited by plaintiffs on the irreparable injury issue are too dissimilar on the facts to be persuasive.

ceeding at appropriate prices, and the Department has done just that in at least two previous instances. See *Vickers Petroleum Corp.*, DOE Case No. DEA–0351 (Aug. 2, 1979) and *Diamond Shamrock Corp.*, DOE Case No. 0420 (June 18, 1979). Similarly, the courts have ample authority to make plaintiffs whole in the event that they should ultimately prevail on the merits.[26]

Finally, public interest factors do not favor injunctive relief. The various individuals and businesses dependent upon oil products from Ashland would be severely harmed by issuance of an injunction since its consequence would be an increase in cost at best and an interruption of supplies at worst. Such harm would, of course, be contrary to the public interest. Moreover, the public interest, as expressed on congressional enactments, favors an equitable sharing of the burdens resulting from the world-wide and national oil shortage. Congress has also indicated that it favors the effective survival of the so-called independents, alongside the huge, multinational integrated oil companies, as one means for maintaining a measure of competition in the oil industry. All of these interests are incompatible with an injunction that would allow these plaintiffs to escape sharing the burdens flowing from the ban on imports from Iran and would thrust these burdens instead on a company which, in good faith, and in reliance on U. S. government policy decided to procure its crude oil from that country.

For the reasons stated, it is this 19th day of December, 1979,

ORDERED That plaintiffs' motions for preliminary injunction be and they are hereby denied.

---

**26.** In the final analysis, plaintiffs can point in this regard only to the injury of administrative difficulties—hardly a factor of sufficient magnitude to outweigh the equities favoring defendants.